95 A.3d 822

**Ernest & Beverly WIRTH, Appellants**

**v.**

**COMMONWEALTH of Pennsylvania, Appellee.**

**John K. Houssels, Jr., Appellant**

**v.**

**Commonwealth of Pennsylvania, Appellee.**

**Thomas Shaker, Appellant**

**v.**

**Commonwealth of Pennsylvania, Appellee.**

**Robert J. Marshall, Jr., Appellant**

**v.**

**Commonwealth of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Submitted Aug. 19, 2013.

Decided June 17, 2014.

132

Christopher Andrews Jones, Esq., Ballard Spahr Andrews & Ingersoll, L.L.P., Philadelphia, for Ernest Wirth and Beverly Wirth.

Wendi Lynn Lotzen, Esq., Ballard Spahr Andrews & Ingersoll, L.L.P., for Ernest Wirth.

Kevin A. Moury, Esq., Claudia M. Tesoro, Esq., Carol L. Weitzel, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

Joseph C. Bright, Esq., Cheryl Ann Upham, Esq., Cozen O'Connor, Philadelphia, for Thomas Shaker, John K. Houssels, Jr. and Robert J. Marshall, Jr.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

134

*OPINION*

Justice BAER.

In this direct appeal, we examine a decision by the Commonwealth Court, sitting *en banc,* which considered the application of Pennsylvania personal income tax (PIT) to various nonresidents, who invested as limited partners in a Connecticut limited partnership, which existed for the sole purpose of owning and operating a skyscraper in the City of Pittsburgh, which ultimately went into foreclosure in 2005. The Commonwealth Court held that the partnership was subject to PIT commensurate with the total debt discharged as a result of the foreclosure, and therefore the nonresident limited partners were liable for PIT in an amount proportionate with their shares in the partnership. In this case that presents several issues of first impression, for the reasons that follow, we affirm.

## *I. BACKGROUND*

In late 1984–early 1985, the five Appellants in this case, a married couple (Ernest and Beverly Wirth) and three individuals (John Houssels, Jr., Thomas Shaker, and Robert Marshall, Jr.), all purchased various interests in a limited partnership known as 600 Grant Street Associates Limited Partnership (Partnership). Appellants' interests in the Partnership ranged from one-quarter of a unit to one unit.[1] All Appellants were non-Pennsylvania residents. The sole purpose of the Partnership, which was organized pursuant to Connecticut law, was the purchase and management of the property located at 600 Grant Street in the downtown section of the City of Pittsburgh, commonly known as the U.S. Steel Building (the Property). In all, 735 limited partners, only 25 of whom were Pennsylvania residents, comprised the Part-

---

1. A one unit interest in the Partnership equated to a 0.151281% interest of the whole. Appellants each purchased their shares in the Partnership through a combination of cash and executed promissory notes. Prior to the events relevant to this case, each Appellant had satisfied their personal obligations under the promissory notes.

nership. All of the limited partners were passive investors; none took an active role in managing the Property.

Investment in the Partnership began when the general partner made a comprehensive "Offering Memorandum" available to potential investors. The memorandum stated that while the Partnership would likely incur economic and tax losses for the first several years of its existence, due to expected growth in the Pittsburgh commercial real estate market, eventually the limited partners would be allocated a substantial gain upon the anticipated sale of the Property. The memorandum further specified that each investor could be subject to negative tax consequences, both under federal and Pennsylvania tax laws. The memorandum also indicated that these tax consequences would be determined primarily based on the financial liquidity of the Property when the mortgage on the Property matured.

With the Partnership in place, it proceeded to purchase the Property in 1985 for $360 million. Of that, $52 million was paid in cash, and the Partnership pledged the Property as collateral to secure a nonrecourse Purchase Money Mortgage Note (PMM Note), with an initial principal balance of the remaining $308 million.[2] Interest on the PMM Note was payable on a monthly basis, at a rate of 14.55% per annum. The PMM Note contained an important caveat, however: should the monthly interest amount exceed the Partnership's net operating income from the Property, the excess did not have to be paid, and instead would defer and compound on an annual basis, subject to the same 14.55% rate. The PMM Note originally delineated the maturity date as November 1, 2001; the parties subsequently extended that date to January 2, 2005.

As the years progressed, the Partnership's net income from operations did not meet the projections of the general partner. Indeed, it incurred net operating losses for accounting, federal

2. In a nonrecourse note, the property mortgaged becomes the only source of repayment for the note. The debtors cannot be held personally liable for the debt, and the lender possesses no other recourse to satisfy the debt other than foreclosure.

tax, and PIT purposes in every year of its existence. Relevant to this case, for PIT purposes, the Partnership allocated those losses to Appellants (and all of the other limited partners) and, because Appellants had no Pennsylvania-based income for 1985–2004, they did not file Pennsylvania PIT returns for those years. Moreover, because the net operating income was less than the monthly interest on the PMM Note, the Partnership did not pay the interest and therefore deferred it as noted above. By June 30, 2005, the compounded, accrued interest totaled $2.32 billion, thus making the total liability on the PMM Note more than $2.6 billion.[3]

When the PMM Note matured on January 2, 2005, given the insurmountable debt that had accrued, the Partnership was unable to sell the Property. Accordingly, on June 30, 2005, the lender foreclosed, and, because the Partnership no longer owned the Property (which was the sole reason for the Partnership's existence), the Partnership soon after liquidated. None of the limited partners, including Appellants, received any proceeds from the Property's foreclosure or the Partnership's liquidation, and therefore lost their entire investments in the Partnership.

■ Following the Property's foreclosure, but prior to the Partnership's liquidation, the Partnership reported a gain as a result of the foreclosure on its federal and state tax filings that consisted of the unpaid balance of the PMM Note's principal and the accrued, compounded interest, totaling $2,628,491,551. *Accord Commissioner v. Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983) (holding, as will be explained in greater detail, *infra* Part III(A), that foreclosures on nonrecourse mortgage notes constitute the disposition of property and therefore result in the realization of income or gain for federal tax purposes equal to the amount of the discharged debt). Concomitantly, the Partnership reported each individual limited partner's respective share of that gain. Therefore, and despite their individual investment losses, the Pennsylvania

---

**3.** Of the accrued, unpaid interest, the Partnership used approximately $121 million to offset income from operations that otherwise would have been subject to PIT.

Department of Revenue (the Department) assessed PIT against Appellants, plus interest and penalties, related to the foreclosure on the Property for tax year 2005. The PIT equaled each limited partner's distributive share of the gain associated with the foreclosure, multiplied by the Pennsylvania PIT rate of 3.07%. *See* 72 P.S. § 7306.[4] Appellants unsuccessfully challenged the assessments in the Department's Board of Appeals and, subsequently, in the Board of Finance and Revenue. Timely appeals to the Commonwealth Court followed.[5]

On January 3, 2013, in four separate decisions, an *en banc* panel of the Commonwealth Court affirmed the Board in part, vacated in part, and remanded.[6] The court began its analysis

4. Section 7306 provides:

> A partnership as an entity shall not be subject to the tax imposed by this article, but the income or gain of a member of a partnership in respect of said partnership shall be subject to the tax and the tax shall be imposed on his share, whether or not distributed, of the income or gain received by the partnership for its taxable year ending within or with the member's taxable year.

For example, Appellant Robert Marshall's distributive share in the foreclosure equaled his share in the Partnership, 0.151281%, multiplied by the total amount due on the PMM Note at the time of foreclosure, $2,628,497,551, or $3,976,417 (.00151281 × $2,628,497,551 = $3,976,417). Appellant–Marshall's PIT is 3.07% of this, or $122,076 (.0307 × $3,976,417 = $122,076). With interest and penalties, the Department assessed him a total of $165,055.24 for tax year 2005.

5. Appeals taken from the Board of Finance and Revenue to the Commonwealth Court sound in that court's appellate jurisdiction; however, they are *de novo* in nature as no record is certified from the Board. *Tool Sales & Serv. Co. v. Bd. of Fin. and Revenue*, 536 Pa. 10, 637 A.2d 607, 610 (1993). The court, as seen in this case, considers facts jointly stipulated to by the parties. Following a decision by the Commonwealth Court, and despite that court acting in its appellate jurisdiction, "any final order of the Commonwealth Court entered in any appeal from a decision of the Board of Finance and Revenue shall be appealable to the Supreme Court, as of right...." 42 Pa.C.S. § 723(b). Accordingly, this appeal was docketed in this Court for direct, rather than discretionary, review.

6. The Court chose Appellant–Marshall's appeal as the lead case, and issued a published decision therein at 41 A.3d 67 (Pa.Cmwlth.2012) (*en banc*). The court then disposed of the remaining three cases with unpublished memorandum decisions, citing to *Marshall* as controlling authority. Unless otherwise required, we will cite only to the *Marshall* opinion herein.

by examining as a threshold matter whether taxing Appellants in the first instance violated the Commerce and Due Process Clauses of the United States Constitution,[7] under the theory that none of them as nonresidents could be subject to the Pennsylvania Tax Reform Code (the Code). While recognizing that in taxation cases, Commerce and Due Process Clause arguments are interrelated, the court opined that "the two should not be intermingled" because, according to the United States Supreme Court, they "are analytically distinct." *Marshall v. Commonwealth,* 41 A.3d 67, 73 (Pa.Cmwlth.2012) (*en banc*) (quoting *Quill Corp. v. N. Dakota,* 504 U.S. 298, 305–06, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992)). The court concluded that Appellants only disputed whether minimum contacts existed to permit Pennsylvania to tax them, and a minimum contacts analysis only implicates due process. Accordingly, the court concluded that Appellants waived the Commerce Clause claim.[8]

Turning to the due process claim, the court determined that a reasonable, definitive connection between Appellants and Pennsylvania existed because the primary purpose of the Partnership was the ownership and management of real estate within the Commonwealth's borders. While it ultimately failed, the Partnership's sole objective was to return a profit on the building, and therefore the Partnership and its limited partners purposely established contacts with Pennsylvania for that purpose. Thus, the court found that subjecting Appellants to PIT did not violate due process. *Id.* at 74 (citing, *e.g., Kulko v. Superior Court of California,* 436 U.S. 84, 92, 98

---

7. U.S. CONST. art. I, § 8, cl. 3; U.S. CONST. amend. XIV, § 1.

8. Specifically, the Commonwealth Court noted:

 Whether a taxing scheme violates the Commerce Clause requires application of a four-part test, the first prong of which requires a court to consider whether the tax "is applied to an activity with a substantial nexus with the taxing State." Though the "minimum contacts" test and the "substantial nexus" prong are similar in phrasing, the Supreme Court in *Quill* rejected the State of North Dakota's argument that they are one and the same: "The two standards are animated by different constitutional concerns and policies."

 *Marshall,* 41 A.3d at 73 (quoting *Quill,* 504 U.S. at 311, 312, 112 S.Ct. 1904) (internal citations omitted).

S.Ct. 1690, 56 L.Ed.2d 132 (1978) (whether minimum contacts exists for purposes of due process is fact specific and "must be weighed to determine whether the requisite 'affiliating circumstances' are present")).

The court next turned its attention to whether the foreclosure upon the Property, and therefore the discharge of the nonrecourse debt associated with it, constituted a taxable event for purposes of PIT. In Pennsylvania, the imposition of PIT is governed by Section 302 of the Code, which provides as follows:

> (a) Every resident individual, estate or trust shall be subject to, and shall pay for the privilege of receiving each of the classes of income hereinafter enumerated in section 303, a tax upon each dollar of income received by that resident during that resident's taxable year at the rate of three and seven hundredths per cent.

> (b) Every nonresident individual, estate or trust shall be subject to, and shall pay for the privilege of receiving each of the classes of income hereinafter enumerated in section 303 from sources within this Commonwealth, a tax upon each dollar of income received by that nonresident during that nonresident's taxable year at the rate of three and seven hundredths per cent.

72 P.S. § 7302. Section 303 of the Code then enumerates eight classes of income, which are subject to PIT. Relevant to this appeal, the court noted that subsections (a)(2) and (a)(3) permit the collection of PIT upon "the net income from the operation of a business, profession, or other activity ..."; and, the "net gains or net income, less net losses, derived from the sale, exchange or other disposition of property, including real property [and] intangible personal property...." *Id.* § 7303(a)(2) & (3).[9] In furtherance of subsection (a)(3), De-

9. In full, Section 7302(a)(2) and (a)(3) provide as follows:

(2) Net profits. The net income from the operation of a business, profession, or other activity, after provision for all costs and expenses incurred in the conduct thereof, determined either on a cash or accrual basis in accordance with accepted accounting principles and practices but without deduction of taxes based on income. For purposes of calculating net income under this paragraph, to the

partment Regulation 103.13 provides, "A gain on the disposition of property is recognized in the taxable year in which the amount realized from the conversion of the property into cash or other property exceeds the adjusted basis of the property." 61 Pa.Code § 103.13(a).[10]

Rather than a matter of statutory interpretation, the court viewed the question of whether PIT applies to the consequence arising from a foreclosure upon a nonrecourse debt as one of regulatory interpretation, and thus gave deference to the Department's interpretation of Regulation 103.13. To that end, the court noted that the Department, "in this matter ... has interpreted [Regulation] 103.13 as applying to real property foreclosures, even when the mortgagor does not receive any cash or other property ... upon foreclosure." *Marshall*, 41 A.3d at 77. The court then looked to the United States Supreme Court's decision in *Tufts*, in which the Court, as a

extent a taxpayer properly deducts an amount under section 195(b)(1)(A) of the Internal Revenue Code of 1986 (26 U.S.C. § 195(b)(1)(A)), as amended, and the regulations promulgated under section 195(b)(1)(A) of the Internal Revenue Code of 1986, the taxpayer shall be permitted a deduction in equal amount in the same taxable year.

(3) Net gains or income from disposition of property. Net gains or net income, less net losses, derived from the sale, exchange or other disposition of property, including real property, tangible personal property, intangible personal property or obligations issued on or after the effective date of this amendatory act by the Commonwealth; any public authority, commission, board or other agency created by the Commonwealth; any political subdivision of the Commonwealth or any public authority created by any such political subdivision; or by the Federal Government as determined in accordance with accepted accounting principles and practices. [ ... ].

72 P.S. § 7303(a)(2) & (3). The remaining classes of income as provided for by Section 7303(a)(1) and (4)-(8), are not relevant for purposes of this appeal.

10. The entirety of Regulation 103.13(a) provides as follows:

*Gain or loss.* A gain on the disposition of property is recognized in the taxable year in which the amount realized from the conversion of the property into cash or other property exceeds the adjusted basis of the property. A loss is recognized only with respect to transactions entered into for gain, profit or income and only in the taxable year in which the transaction, in respect to which loss is claimed, is closed and completed by an identifiable event which fixes the amount of the loss so there is no possibility of eventual recoupment.

61 Pa.Code § 103.13(a).

matter of federal tax law, held that "where a lender forecloses on property securing a nonrecourse loan of a partnership, for tax purposes the amount realized by the partnership from the disposition of the property is the full amount of the nonrecourse obligation." *Id.* (citing *Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863); *see also Crane v. Commissioner,* 331 U.S. 1, 14, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947) (holding that when a seller of real property "transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another."). Since *Tufts,* the Internal Revenue Service (IRS) has continued to find tax liability under what has become known as the "Tufts rule," as further discussed herein in Part III(A), upon the disposition of nonrecourse debts due to foreclosures.

For guidance, the Commonwealth Court looked to Section 1001 of the Internal Revenue Code (IRC), which states that if the amount realized from "the sale or other disposition of property" exceeds the adjusted basis, then the gain is taxable as income. 26 U.S.C. § 1001(a). Importantly to the Commonwealth Court, the federal definition of "amount realized," in accord with Department Regulation 103.13, is limited to "money received plus the fair market value of the property (other than money) received." *Id.* § 1001(b). Given the similarities in phraseology between the federal and Pennsylvania sections, the court concluded,

> because [the Department's] interpretation of its regulation is consistent with well-settled interpretations of similar federal tax provisions, [the Department's] interpretation of Section 103.13 as applying to real property foreclosures, even when the mortgagor does not receive any cash or other property (*i.e.,* proceeds) upon foreclosure, is reasonable and will not be disturbed by this Court.

*Id.* at 78.

The court further determined that the investment loss suffered by Appellants did not save them from tax liability. The court noted that the gain associated with the Property was attributable to the Partnership as the entity which owned

the Property. However, the limited partners, including Appellants, were liable for the gain as individuals based upon the individual shares in the partnership. 72 P.S. § 7306. Accordingly, in as much as the Commonwealth Court initially had to determine whether the Department correctly imposed PIT liability upon Appellants, it concluded that Appellants' actual investment loss associated with the Partnership's failure and liquidation was of no moment, reasoning: "[t]he issue here is whether the Partnership encountered a gain on disposition of the Property, not whether [Appellants] recovered the purchase price of [their] Partnership interests or, stated otherwise, suffered a loss on [their] investment[s]." *Marshall*, 41 A.3d at 80.

The court next analyzed whether the Department correctly calculated the amount of PIT due from Appellants. It first noted that, as is black letter tax law, a gain upon the disposition of property occurs when "the amount realized from the disposition of the property exceeds the adjusted basis of the property at the time of disposition." *Id.* at 81. With that, the court initially determined that a remand to Board of Finance and Revenue would be required no matter what it decided, because the Board had failed to calculate the adjusted basis in the Property, given that it had not taken evidence regarding depreciation, amortization, or any other factor which could affect this figure.

This somewhat minor point aside, the court next moved to examine what, if any, amount of gain the Partnership realized from the foreclosure upon the Property. In citing extensively to *Tufts*, the court determined that the Partnership, at a minimum, realized income "in the form of the extinguishment of its obligation to repay the principal amount of the PMM note . . . –$308 million." *Id.* at 84. The majority recognized, however, that *Tufts* did not analyze the question of including accrued but unpaid interest, which in the instant case totaled $2.32 billion. The court thus turned to *Allan v. Commissioner*, 856 F.2d 1169, 1173 (8th Cir.1988), which held that, under *Tufts*, "the amount realized is the full amount of the nonrecourse liabilities which are discharged as a result of the

transfer of the property." Given the reasoning of *Allan*, the court again found the decision by the Department, under its promulgated regulations, to impose PIT on the full amount of principal and interest was reasonable and within the Code's provisions and Department's regulations.

The court next analyzed whether Appellants' tax liabilities could be reduced or offset in any manner, by examining whether the taxable amount of the accrued, but unpaid, interest owed by the Partnership ($2.32 billion) should be reduced to only that portion of the unpaid interest utilized by the Partnership over the course of its existence to negate operational income that otherwise would have been subject to PIT in previous years (a total of $121 million, *see supra* note 3). Specifically, the panel examined whether the net operational losses incurred by the Partnership could reduce the amount of assessed PIT. The majority noted, however, that unlike the federal IRC, which defines income in an all-encompassing manner,[11] the Code enumerates eight specific categories of income, *see supra* note 9, of which net profit from business operations (72 P.S. § 7303(a)(2)), and net profit from the disposition of property (*id.* § 7303(a)(3)), are two distinct classifications. The court further stated that Department Regulation 121.13(a) prohibits the "offset [of] a gain in one class of income with a loss in another class of income." 61 Pa.Code § 121.13(a).[12] Given this regulation, the court refused to permit Appellants to reduce the taxable amount

11. *See* 26 U.S.C. § 61(a) (defining gross income as "all income from whatever source derived....").

12. In full, Regulation 121.13(a) provides as follows:

Under the provisions of Article III of the Tax Reform Code of 1971 (72 P.S. §§ 7301–7361) a person shall not be allowed to offset a gain in one class of income with a loss in another class of income. However, a gain may be offset with a loss in the same class of income but limited to the amount of the gain if the income class is one in which net income rather than gross income is reported. For example, if a person experiences a net loss from the sale or exchange of property he shall not enter this loss on Form PA–40 and use this loss to offset income from compensation. However, both gains and losses from the sale or exchange of property may be entered on Schedule D and thus offset part or all of the income in this class.

61 Pa.Code § 121.13(a).

arising from the disposition of the Property by losses suffered during the operation of the business.[13]

Finally, the court considered whether Appellants were disparately treated by the Department because they were ultimately liable for a greater PIT than the limited partners who were Pennsylvania residents. Specifically, Appellants argued that while the Department permitted the Pennsylvania-resident limited partners to offset their PIT liability arising from the foreclosure with the income loss associated with the failed investment in the Partnership, Appellants and the remaining non-resident limited partners were not given the same ability to offset.[14] Appellants contended that such treatment violated the Privileges and Immunities, Commerce, and Equal Protection Clauses of the United States Constitution,[15] as well as the Uniformity Clause of the Pennsylvania Constitution.[16] The court denied relief on the constitutional claims, noting that intangible personal property, like an ownership interest in a limited partnership, is localized in, and sourced to, the domicile of the taxpayer. For taxation purposes, the foreclosure on the Property was a realization of income from within

13. For similar reasons, the Commonwealth Court majority refused to apply the so-called "tax benefit rule," which will be explained in greater detail *infra* Part IV, to reduce Appellants' tax liability. For ease of discussion, we briefly note that the tax benefit rule is a creation of federal common law, which has been used by the IRS and federal courts to reduce the detrimental effect that annual accounting methods may have on tax liability. As recognized by the United States Supreme Court, the tax benefit rule is utilized only in situations where the occurrence of an event in an earlier tax year that permitted a deduction, subsequently results in realized income in a later tax year. *See Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 388–89, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). While a taxpayer is normally responsible for including that recovered income in the subsequent tax year, under the tax benefit rule, the recovery is not includible to the extent that the earlier deduction failed to reduce the amount of the tax owed.

14. For clarity, we note that these constitutional contentions differed from the "cross-class deduction" issue just discussed. Section 7303(a)(3) categorizes dispositions of real property and intangible personal property within the same class of income. Accordingly, deductions between the two would normally be permitted.

15. U.S. Const. art. IV, § 2; art. I, § 8, cl. 3; & amend. XIV, § 1, respectively.

16. Pa Const. art. VIII, § 1.

Pennsylvania, while the investment loss suffered by Appellants, as nonresidents, was sourced outside of the Commonwealth, *i.e.*, in each Appellants' home state. Thus, despite the fact that the disposition of real property and the disposition of intangible personal property both fall with the Section 7303(a)(3) class of income, given that federal constitutional law prohibits the Department from assessing PIT upon income nonresidents gain from outside of Pennsylvania, *see, e.g.*, *Shaffer v. Carter*, 252 U.S. 37, 56, 40 S.Ct. 221, 64 L.Ed. 445 (1920), the court concluded that it follows that a deduction of Pennsylvania-sourced income cannot come from losses sourced to a foreign jurisdiction. Therefore, no disparate treatment occurred between resident limited partners and Appellants.

Judge Patricia McCullough, joined by Judge Robin Simpson, dissented, articulating three main points. First, the dissent averred that the applicable Pennsylvania Tax Code provisions and Department regulations did not support the finding that PIT could be assessed on the foreclosure, regardless of the *Tufts* decision. Unlike the IRC, which defines income broadly, the Code is explicit in what is and is not income. The dissent therefore contended that, to the extent the Code is ambiguous regarding whether the foreclosure upon a nonrecourse mortgage is taxable, the Code must be construed strictly in favor of the taxpayers, and therefore absent direction from the General Assembly that situations such as that presented instantly fall within the Code, courts should construe applicable Pennsylvania law against imposing such a tax.

Second, assuming *arguendo* that PIT could be assessed, the dissent argued that the tax benefit rule should have been applied to recognize the "economic reality" of the situation. The only benefit that Appellants ever realized from their venture into the Partnership was the sheltering of the $121 million in operational income, and therefore, in the dissent's view, if Appellants owed any PIT at all, it would be upon their respective shares of the $121 million.

Finally, the dissent asserted that under the Pennsylvania Constitution's Uniformity Clause, Appellants as non-residents

should have been given the ability to offset their assessed PIT in the same manner as Pennsylvania-domiciled limited partners. The dissent disagreed with the majority's reasoning that, because income cannot be taxed across state borders, losses likewise should not be able to be deducted. Moreover, and specific to the Uniformity Clause argument, in the Dissent's view, both resident and non-resident limited partners in the Partnership were all on equal footing in the Partnership, *i.e.,* members of the same class as all were passive investors, each of whom sustained the same loss of their respective investments. Thus, the dissent concluded that the Uniformity Clause is violated "where taxpayers enjoying the same privilege of receiving, earning[,] or otherwise acquiring the same amount of income as others [are] required to pay a larger dollar amount of taxes." *Marshall,* 41 A.3d at 104 (McCullough, J., dissenting) (citing *Amidon v. Kane,* 444 Pa. 38, 279 A.2d 53 (1971)).

■■ Following the decision, Appellants individually filed exceptions, which the Commonwealth Court denied with the same 5–2 majority, with Appellant–Marshall's case again serving as the lead, *see Marshall v. Commonwealth,* 50 A.3d 287 (Pa.Cmwlth.2012) (*en banc*), and then decided the remaining Appellants' exceptions in unpublished memoranda. Following the court's denial of exceptions, Appellants sought direct review in this Court, and upon dispositional review, we consolidated the four matters and ordered that the case be submitted on briefs for a full opinion. Appellants asserted nine allegations of error by the Commonwealth Court, which will be addressed in five parts.[17] The questions surrounding applica-

17. Verbatim, the issues raised by Appellants in their consolidated brief are as follows:

 a. Did Pennsylvania have the requisite constitutional nexus to impose Personal Income Tax on the Taxpayer from gain on a foreclosure, when the Taxpayer's only contact with Pennsylvania was the ownership of a limited partnership interest in a partnership that owned commercial property here?

 b. Did the foreclosure on the Property owned by Partnership convert the Property into cash or other property within the meaning of Pennsylvania Regulation Section 103.13, thus resulting in a

tion of the various constitutional provisions, such as the Due Process and Commerce Clauses of the United States Constitution, and Uniformity Clause of the Pennsylvania Constitution, comprise pure questions of law, for which our standard of review is *de novo* and our scope of review is plenary. *See Commonwealth v. Janssen Pharmaceutica, Inc.*, 607 Pa. 406, 8 A.3d 267, 271 (2010). Similarly, whether the assessment of PIT based upon the foreclosure of the Property, and the subsidiary questions stemming therefrom, are also pure questions of law, to which the same standard and scope of review apply. *Id.*

> taxable gain for Pennsylvania Personal Income Tax purposes, when the parties stipulated otherwise?
> c. Was the Personal Income Tax correctly interpreted to impose tax on an alleged gain, when the Taxpayer in fact realized an economic loss?
> d. If a gain was realized under Regulation Section 103.13, did the amount realized for purposes of calculating the gain consist not only of unpaid principal on the debt securing the Property, but also accrued but unpaid interest that did not result in any tax benefit for the Taxpayer?
> e. Should the Taxpayer's loss on liquidation of the Partnership have been included in the calculation of any gain?
> f. Did Pennsylvania's tax benefit rule require that the amount of accrued but unpaid interest that did not result in any tax benefit for the Taxpayer be excluded from any amount realized on the foreclosure?
> g. Did Act 2002–89, effective for tax years beginning after December 31, 2000, require the deduction of straight-line depreciation for years prior to 2001?
> h. If the loss realized by the Taxpayer on liquidation of the Partnership is taken into account in calculating any taxable gain for Pennsylvania Personal Income Tax purposes, was the Taxpayer's basis in his Partnership interest correctly calculated?
> i. Did the imposition of Pennsylvania Personal Income Tax on the Taxpayer violate any of the Uniformity Clause, Privileges and Immunities Clause, Equal Protection Clause, Due Process Clause or Commerce Clause of the applicable Pennsylvania or United States Constitutions?

Issues g. and h. will not be addressed in this opinion, as we view them properly as the subject of the remand order by the Commonwealth Court regarding the adjusted basis in the Property, with which we agree and Appellants have not substantially challenged in the argument section of their joint brief. Further, a tenth issue raised solely by Ernest and Beverly Wirth at 82 MAP 2012, regarding potential error in the order issued by the Board of Finance and Revenue and the failure of the Commonwealth Court to correct that error, will be discussed in full, *infra*, Part VII.

## II. THE COMMERCE AND DUE PROCESS CLAUSES

As the Commonwealth Court did before us, we initially address questions concerning whether the Commerce and Due Process Clauses of the federal constitution prohibit the Department from assessing PIT against Appellants at all. We would not typically turn first to constitutional issues. However, if either of these provisions bar the imposition of PIT, it will be unnecessary for us to examine the statutory questions raised by Appellants. Accordingly, we examine them as threshold matters.

### (A) Commerce Clause

■ We concentrate first on the Commonwealth Court's holding that Appellants waived any contentions that they could not be assessed PIT for the foreclosure of the Property based upon the Commerce Clause. The court below deemed any Commerce Clause arguments to be waived as not sufficiently developed. The court, citing to language from the United States Supreme Court, faulted Appellants for not sufficiently distinguishing between the Commerce Clause and the Due Process Clause arguments. See Marshall, 41 A.3d at 73 (quoting Quill, 504 U.S. at 305–06, 112 S.Ct. 1904 (recognizing that, in taxation cases, Commerce and Due Process Clause arguments are interrelated but "the two should not be intermingled" because the two constitutional provisions "are analytically distinct"; Commerce Clause analyses focus on a substantial nexus between the taxpayer and taxable event, while the Due Process Clause concerns whether the taxpayer had minimum contacts with the tax assessing state)).

Appellants first contend that the court below erred in finding waiver sua sponte, because the Department never sought a finding of waiver. Substantively, Appellants argue that the finding of waiver was inappropriate because arguments addressed simultaneously both constitutional concepts. According to Appellants, "[i]n an opinion released just weeks after Quill, the Supreme Court held that '[t]he principle that a State may not tax value earned outside its borders rests on the fundamental requirement of both the Due Process and

Commerce Clauses that there be some definite link, some minimum connection, between a state and the person, property[,] or transaction it seeks to tax.'" Appellants' Brief at 21 (quoting *Allied–Signal, Inc. v. Dir., Div. of Taxation*, 504 U.S. 768, 777, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (internal marks omitted)). In Appellants' view, using "minimum contacts" and "substantial nexus" interchangeably, therefore, should not result in waiver of the Commerce Clause claim. Rather, the same facts support both constitutional aspects of the case: that Appellants "did not reside in or conduct any activities in Pennsylvania; [and their] interest[s] in the Partnership [were] never employed as capital or localized in connection with a trade or business so as to establish a business situs for the interest of Pennsylvania." Appellant–Marshall's Commonwealth Court Brief at 28.

The Department responds by first noting that the Commonwealth Court below did not err in *sua sponte* finding the Commerce Clause contentions waived. The Department remarks that, as the aggrieved parties in an appellate setting, the onus was on Appellants to develop their arguments sufficiently. Substantively, the Department relies upon the Commonwealth Court's citation of *Quill*, while further observing that a government "may comply with one constitutional provision and nonetheless violate the other ... so it is inappropriate to lump them together, as [Appellants] did." Commonwealth's Brief at 29. Unlike the minimum contacts framework of a due process analysis, "the Commerce Clause reflects 'structural concerns about the effects of state regulation on the national economy,'" and, in the Department's view, Appellants have failed in every way to connect the assessment of PIT upon them to the degradation of the national economy. *Id.* at 30–31 (quoting *Quill*, 504 U.S. at 312, 112 S.Ct. 1904).

We agree with the Department. While Appellants protest that the Commonwealth Court should not have *sua sponte* found waiver, our rules of appellate procedure are explicit that the argument contained within a brief must contain "such discussion and citation of authorities as are deemed pertinent." Pa. R.A.P. 2119(a). "[W]here an appel-

150

late brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived. It is not the obligation of [an appellate court ... ] to formulate [a]ppellant's arguments for him." *Commonwealth v. Johnson*, 604 Pa. 176, 985 A.2d 915, 924 (2009) (internal citations omitted). Moreover, because the burden rests with the appealing party to develop the argument sufficiently, an appellee's failure to advocate for waiver is of no moment. *See Connor v. Crozer Keystone Health Sys.*, 832 A.2d 1112, 1118 (Pa.Super.2003).

Our careful review of Appellants' briefs filed in the Commonwealth Court reveals that the entirety of the Commerce Clause argument before that tribunal was as follows: "A state's ability to tax is limited by the Commerce and Due Process Clauses of the United States Constitution." Appellant–Marshall's Commonwealth Court Brief at 27. The remainder of the constitutional argument focuses exclusively upon the notion of minimum contacts, which, as discussed below, relates solely to an alleged violation of the Due Process Clause. Accordingly, the Commonwealth Court did not err in finding Appellants' Commerce Clause contentions waived for underdevelopment, and we will not address the merits of that claim.

### (B) Due Process

We next turn to the properly preserved due process issue. As noted above, the pertinent analysis concerning whether a person or entity may be liable for legal damages or, in this case, taxes, under notions of due process, revolves around the well-established notion that the potentially liable party must have "minimum contacts" with the forum jurisdiction. *See Kachur v. Yugo Am., Inc.*, 534 Pa. 316, 632 A.2d 1297, 1300 (1993) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The existence of minimum contacts turns on the related question of whether the person at issue might "reasonably anticipate being haled into court," or, as seen here, may reasonably

anticipate being taxed upon a taxable event. *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). The High Court in *Hanson* continues:

[T]he application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Hanson*, 357 U.S. at 253, 78 S.Ct. 1228.

Appellants' argument regarding these standards never speaks to purposeful availment, which, again, is the touchstone of a minimum contacts analysis. Rather, the entirety of their contentions regarding this issue is as follows:

Here, [Appellants] had no minimum contacts with Pennsylvania, let alone substantial nexus. [They] did not reside in or conduct any activities in Pennsylvania. [Their] interest in the Partnership was never employed as capital or localized in connection with a trade or business so as to establish a business situs for the interest in Pennsylvania. (Jt. Stip. ¶ 9; R. 33a–34a.) Without such minimum contacts, a state may not tax an individual whose only connection with the state is a passive limited partnership interest in a partnership doing business in that state. *Lanzi v. Ala. Dep't of Rev.*, 968 So.2d 18 (Ala.Civ.App.2006), *cert. denied* (Ala. 2007); *BIS LP, Inc. v. Dir., Div. of Taxation*, 25 N.J.Tax 88 (2009), *aff'd*, 26 N.J.Tax 489 (N.J.Super.App.Div.2011).

Appellants' Brief at 19.

The Department responds that Appellants' contentions that they failed to conduct any business activities or establish a business situs within Pennsylvania is specious because the "focal point" of the entire controversy, the foreclosed upon Property, was situate in Pennsylvania. The Department contends that their interest in the Partnership, while limited, was hardly passive due to the amounts of money invested, the lifespan of the Partnership (over twenty years), and the Partnership's ownership of the Property. Further, the memo-

randum of understanding reviewed by each individual limited partner, including Appellants, indicated that their investment may lead to PIT liability.

The Department notes that "the presence of property in a State may bear on the existence of jurisdiction by providing contacts among the forum State, the defendant, and the litigation." Department's Brief at 26 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 207, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). In the Department's view, should we accept Appellants' contentions, had the Partnership garnered any income at all from the Property, none of that income would have been taxable by the Department, "even though the Partnership's only reason for existence was to own and manage a Pennsylvania office tower." *Id.* at 27. Instead, argues the Department, the Partnership "purposely availed itself of the privilege of doing business in Pennsylvania when it acquired the [Property]," managed it, and attempted to turn a profit off of it. *Id.* Pursuant to the pass-through provisions of Section 7306, *supra* note 4, Appellants likewise availed themselves of Pennsylvania taxation jurisdiction.

For these reasons, the Department asserts that the two foreign cases cited by Appellants are of no assistance to them. The Department notes that in *Lanzi*, the appealing taxpayer, a Georgia resident, was a limited partner in a family-operated partnership, created under the laws of Alabama, that existed to " 'make a profit' and to manage a preserve 'family assets' " through the buying and selling of bonds, stocks, and other securities. *Lanzi*, 968 So.2d at 20. After the taxpayer received distributions from the partnership, the Alabama Department of Revenue audited the taxpayer and assessed him Alabama state income tax. The Court of Civil Appeals of Alabama agreed with the taxpayer that the assessment of tax against him violated the Due Process Clause because his participation in an Alabama limited partnership did not establish a "business situs" or a "commercial domicile," and therefore the taxpayer had not established minimum contacts within Alabama for purposes of taxation. *Id.* at 22. Further, argues the Department, *BIS* has no bearing on the instant

case at all, given that the Tax Court of New Jersey in *BIS* never examined minimum contacts. Rather, *BIS* solely concerned whether a subsidiary company was "integrally related" with its parent for "unitary business" tax purposes. *BIS*, 25 N.J.Tax at 104–05.

We agree with the Department. The narrow argument proffered by Appellants, that they were out-of-state residents involved in a foreign, limited partnership and nothing more simply is not accurate. Instead, the Department's contention that the primary purpose of the Partnership was to own, operate, and gain income from a Pennsylvania office tower rings true; and, were we to accept Appellants' arguments, the ability to tax non-Pennsylvanians engaged in commercial real estate transactions within our state could be arguably foreclosed. Entities "that operate in multiple states are not immune from ... state taxation," and so long as a state fairly apportions and taxes a foreign entity for business conducted within that state, the Due Process Clause is not violated. *Glatfelter Pulpwood Co. v. Commonwealth*, 619 Pa. 243, 61 A.3d 993, 1008 (2013).

For these same reasons, we reject Appellants' advocacy concerning *Lanzi* and *BIS*. To that end, we concur with the Department that *Lanzi* is distinguishable from this case due to the prime element contained within this appeal: the Property and its situs in Pennsylvania. Moreover, our reading of *BIS* reveals that it is not relevant to the case at hand, as the court in *BIS* focused exclusively on New Jersey statutory provisions concerning unitary corporations. For all of these reasons, we find that Appellants purposefully availed themselves to Pennsylvania law through the Partnership's ownership and operation of the Property, thus establishing minimal contacts within Pennsylvania, and accordingly were properly subjected to an assessment of PIT.

## III. PIT AND FORECLOSURE ON A NONRECOURSE DEBT

Having decided that Appellants' may be taxed in Pennsylvania under these circumstances as a matter of constitutional

law, we next consider whether the Commonwealth Court correctly determined that, pursuant to Section 7303(a)(3) of the Tax Reform Code and Department Regulation 103.13, PIT could be assessed against Appellants for their share in any gain associated with the nonrecourse mortgage foreclosure of the Property. Appellants contend that PIT cannot be assessed for two reasons: (1) pursuant to Regulation 103.13, a taxable event concerning the disposition of property only occurs upon the conversion of the property "into cash or other property," and such a conversion never happened in this case; and/or (2) Appellants never realized income from the foreclosure of the Property because of the ultimate loss of their investments in the Partnership. We will address each contention in turn.

### (A) Section 7303(a)(3) and Regulation 103.13

As noted above, nonresidents shall pay a tax at the rate of 3.07% for, *inter alia,* the privilege of receiving income "derived from the sale, exchange or other disposition of property, including real property [and] intangible personal property . . . ." 72 P.S. § 7303(a)(3); *see also id.* § 7302(b). In furtherance of subsection (a)(3), Department Regulation 103.13 provides, "A gain on the disposition of property is recognized in the taxable year in which the amount realized from the conversion of the property into cash or other property exceeds the adjusted basis of the property." 61 Pa.Code § 103.13. The primary question presented instantly is whether the rule set forth by the United States Supreme Court in *Tufts* that "where a lender forecloses on property securing a nonrecourse loan of a partnership, for tax purposes the amount realized by the partnership from the disposition of the property is the full amount of the nonrecourse obligation," *Marshall,* 41 A.3d at 77 (citing *Tufts,* 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863), applies under Section 7303(a)(3) and Regulation 103.13.

Appellants argue that the plain language of Regulation 103.13 precludes the Department's taxation of the discharge of the obligation to pay the debt associated with the Property, because the nonrecourse foreclosure upon the Property never

resulted in the "conversion of the [P]roperty *into cash or other property.*" Appellants' Brief at 23 (quoting Regulation 103.13) (emphasis in brief). Appellants note that, in the Commonwealth Court, the Department contended that its construction of Regulation 103.13 consistently with the *Tufts* rule closed a loophole in Pennsylvania tax law. Appellants counter, however, that if a loophole in the taxing scheme does exist, "then such a loophole is for the legislature to close." *Id.* at 25 (quoting *Allebach v. Commonwealth,* 546 Pa. 146, 683 A.2d 625, 629 n. 6 (1996)). Appellants continue, "there is no authority for the Department's incorporation of federal tax law ... to shoehorn gain from a foreclosure into a category of PIT income" as defined either by the Code or Regulation 103.13. *Id.* at 26. Appellants argue that the Department has never before taken a position that nonrecourse foreclosures are subject to PIT, and to the extent it makes that assertion currently, it is inconsistent with the Code and Regulation 103.13, and therefore cannot prevail.

The Department responds that its application of Regulation 103.13 is straightforward in large part because of Appellants' statuses as nonresidents. It notes that the Code permits the Commonwealth to tax nonresident individuals only for income derived from sources within Pennsylvania. 72 P.S. § 7308. Under Section 7301(k)(1) of the Code, 72 P.S. § 7301(k)(1), Pennsylvania-sourced income is defined, *inter alia,* as the "net profits, gains, dividends, interest or income enumerated and classified under section [7303] ... by reason of ownership or disposition of any interest in real or tangible personal property in this Commonwealth." In the Department's view, the Partnership, and therefore Appellants through their status as limited partners, received a gain from the disposition of the Property, which was situate in Pennsylvania, in the form of the release of the nonrecourse debt.

The Department then continues that the assessment of PIT is consistent with the plain language of Regulation 103.13, when the regulation is read *in pari materia* with the statutes it is designed to forward. The Department notes that both Section 7303(a)(3) of the Code and Regulation 103.13 are

entitled "net gains or income from the disposition of property." Turning first to the statutory provision, the Department illustrates that the language is all-encompassing of exchanges or dispositions of real property that result in a net gain, with the exception of several specifically enumerated circumstances that are irrelevant to the case at hand. Section 7303(a)(3) never specifically demands that the net gain be in the form of "cash or other property," as Appellants suggest Regulation 103.13 requires.

Rather, and consistent with the plain language of the Section 7303(a)(3), the Department emphasizes that Regulation 103.13 primarily addresses timing concerns, as it specifies that the gains and losses associated with the disposition of property are only recognized within the taxable year in which the transaction occurred. In the Department's view, nothing in Regulation 103.13 prohibits it from taxing Appellants on the disposition of the Property based upon the lack of "cash or other property" being involved in the transaction. To the contrary, the Department argues that *Tufts* is consistent with Section 7303(a)(3), and parallels the language from the controlling statutory section that the Department may assess tax upon the net gain associated with the disposition of real property, given that *Tufts* holds that the "amount of the canceled debt is included in the amount realized, and enters into the computation of gain or loss on the disposition of the property." Department's Brief at 35 (quoting *Tufts*, 461 U.S. at 310 n. 11, 103 S.Ct. 1826).

We agree with both the Commonwealth Court and the Department that the *Tufts* rule is encompassed within the plain meaning of "disposition of real property," as contemplated by Section 7303(a)(3) and Regulation 103.13, and that the assessment of PIT was proper.[18] The *Tufts* rule has its

18. As an aside, we are compelled to comment briefly upon the manner in which the Commonwealth Court decided that the *Tufts* rule is encompassed within Section 7303(a)(3) and Regulation 103.13. The majority below perceived the issue as whether the Department was interpreting Regulation 103.13 to contain the *Tufts* rule, and thus opined initially, "[w]ell-settled precedent establishes that courts defer to an administrative agency's interpretation of its own regulations unless

that interpretation is unreasonable. The task of the reviewing court is limited to determining whether the agency's interpretation is consistent with the regulation and with the statute under which the regulation was promulgated." *Marshall*, 41 A.3d at 77. The court then went on to examine the Department's arguments vis-à-vis Regulation 103.13 and *Tufts*, found the Department's position "to be reasonable," gave it deference, and therefore refused to "disturb" it. *Id.* at 78.

Given our ultimate disposition that Section 7303(a)(3) and Regulation 103.13 are unambiguous and permit the assessment of PIT based upon the foreclosure of a nonrecourse encumbered property, we find it unnecessary to determine, as a matter of substantive law, the amount of deference (if any) the Department's contentions herein should be given. Nevertheless, given that the Commonwealth Court's opinion below is published, precedential, and from an *en banc* panel of the court, we are constrained to note that, in our respectful view, the court overstated the amount of deference due an agency's interpretation of a regulation. Federal caselaw, to which this Court has generally adhered to concerning regulatory interpretation, has followed two tracts, depending upon the time of agency interpretation at issue.

The first, often connoted as *Chevron* deference, occurs where an agency steps in via formal rulemaking (such as notice-and-comment procedures) where the legislative body has been silent or ambiguous. When an agency fills a statutory void with a promulgated regulation, it creates what are referred to as "legislative rules," which are accorded a high degree of deference so long as they are based upon a permissible construction of the statute and are reasonable. *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A lesser amount of deference, commonly referred to as *Skidmore* deference, is given to what are termed "interpretive rules," which are "derive[ed] from the specialized role and expertise of administrative agencies" and are generally not subjected to formal notice-and-comment procedures. *N.W. Youth Servs., Inc. v. Commonwealth, Dep't of Pub. Welfare*, 620 Pa. 140, 66 A.3d 301, 311–12 (2013). These "interpretive rules" include agency publications such as "classification rulings" and "interpretations contained in policy statements, agency manuals, and enforcement guidelines." *United States v. Mead Corp.*, 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). An agency's interpretation in this regard will be owed deference based upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *N.W. Youth Servs.*, 66 A.3d at 312 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

Moreover, were interpretation of an agency regulation required in this case, an added layer of difficulty exists, namely, that the Department has never before, at least in any manner by which we can locate, assessed PIT pursuant to *Tufts*, nor has it promulgated any rules, bulletins, decisions, or the like that have examined *Tufts*. Accordingly, by advocating that *Tufts* applies to Regulation 103.13, the Department would be furthering an interpretation of a regulation for the first time in the course of litigation where it is a party, and accordingly is, at the most, on par with an interpretive rule. To that end however, we note

origins in a 1947 decision of the High Court, *Crane v. Commissioner*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), in which the Court first determined that the seller of property encumbered by a nonrecourse mortgage must include on his federal tax return, as a gain of income, the unpaid balance upon the mortgage debt. Section 111(b) of the IRC of 1938 (today, codified in the IRC at 26 U.S.C. § 1001(b)), "define[d] the 'amount realized' from 'the sale [ . . . ] of property' as 'the sum of any money received plus the fair market value of the property (other than money) received'. . . ." *Id.* at 12, 67 S.Ct. 1047. The Court then noted that cases that had considered this provision had "already repudiated the notion that there must be an actual receipt by the seller himself of 'money' or 'other property' in their narrowest senses." *Id.* at 13, 67 S.Ct. 1047. Rather, when the seller of property "transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another." *Id.* at 14, 67 S.Ct. 1047. This was especially true in *Crane*, when the amount of the mortgage was less than the adjusted basis in the property sold. *Id.*

 In *Tufts*, then, the United States Supreme Court accepted review to examine whether *Crane* should be taken to the next logical step: a situation where the amount owed on

that at least in regard to interpreting a statute, this Court has refused to give a state agency deference to its position when "there [was] nothing in the record indicating that the [agency] had considered and decided [the issue involved] at a point prior to the instant litigation." *Malt Beverages Distributors Ass'n v. Pa. Liquor Control Bd.*, 601 Pa. 449, 974 A.2d 1144, 1154 (2009) (citing *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (providing that "[d]eference to what appears to be nothing more than an agency's convenient litigation position would be entirely inappropriate.")); *but see* Bradley George Hubbard, *Deference to Agency Statutory Interpretations First Advanced in Litigation? The Chevron Two–Step and the Skidmore Shuffle*, 80 U. Chi. L.Rev. 447 (Winter 2013) (noting several decisions of various United States Circuit Courts of Appeals that consider an agency's interpretation of a regulation during the course of litigation in accord with *Skidmore* ). While we opine that the Commonwealth Court overstated the deference due instantly, we nevertheless do not decide the issue given the conclusion that the plain language of Section 7303(a)(3) and Regulation 103.13(a) controls.

the nonrecourse mortgage exceeded the adjusted basis in the property.[19] The *Tufts* Court first restated the salient portion of the *Crane* decision: "[t]he purchaser's assumption of the liability thus resulted in a taxable economic benefit to [Crane], just as if she had been given ... a sum of cash sufficient to satisfy the mortgage." *Tufts*, 461 U.S. at 306, 103 S.Ct. 1826. When a loan is granted, the mortgagee receives the "resultant benefits" of what amounts essentially to tax-free money, but "on the assumption that the mortgage will be paid in full." *Id.* at 308, 103 S.Ct. 1826. Therefore, "when encumbered property is sold or otherwise disposed of and the purchaser assumes the mortgage, the associated extinguishment of the mortgagor's obligation to repay is accounted for in the computation of the amount realized" upon the disposition of the property. *Id.* at 308–09, 103 S.Ct. 1826. Indeed, the Court perceived that situations such as that in the case *sub judice* were frequently occurring in tax shelter investment arrangements, noting that "if the fair market value of the property falls below the amount of the outstanding obligation," in many instances "the mortgagor is free to abandon the property to the mortgagee and be relieved of his obligation." *Id.* at 312, 103 S.Ct. 1826. This does not negate the fact, however, that at the beginning of the ownership of the encumbered property, "the mortgagor received the loan proceeds tax-free," and reneged on the promise to repay those funds. *Id.* at 310, 103 S.Ct. 1826.

Appellants argue that while the *Tufts* rule certainly has a basis in the IRC, as all assessed tax must revert to the basic, but all-encompassing, definition of gross income—"all income from whatever source derived," 26 U.S.C. § 61—the Pennsylvania Tax Reform Code does not have the same definition, but instead defines income within the aforementioned eight distinct classifications. *See* 72 P.S. § 7301(j) (defining "income" as the "compensation, net profits, gains, dividends, interest or income enumerated and classified under [72 P.S. § 7303(a)(1)–

19. By the time *Tufts* reached the Supreme Court, Section 111(b) of the IRC of 1938 had been re-codified to its current position at Section 1001(b).

(8) ] . . . . "). However, the IRC and the Code are not as different as Appellants posit.

The foreclosure of the Property cannot be described as anything other than the "disposition of real property," which is included within the Code as a class of income in Section 7303(a)(3). *See* BLACK'S LAW DICTIONARY (9th ed.) (defining "disposition" as "[t]he act of transferring something to another's care or possession, esp[ecially] by deed or will; the relinquishing of property . . ."; and defining "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) *either to gain title or to force a sale* in order to satisfy the unpaid debt secured by the property.") (emphasis added).[20] Upon the disposition of property, like Section 111(b) of the IRC of 1938 and the current IRC Section 1001(b), Regulation 103.13 speaks to the "amount realized from the conversion of the property into cash or other property. . . ." 61 Pa.Code § 103.13; *see also* 26 U.S.C. § 1001(b) ("The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.").

While Appellants aver that the phrase "into cash" precludes the assessment of PIT because they never received cash, the *Crane* Court rejected the same argument over sixty years ago, "repudiat[ing] the notion that there must be an actual receipt by the seller himself of any 'money' or 'other property' in the narrowest sense." *Crane*, 331 U.S. at 13, 67 S.Ct. 1047. As noted above, when a mortgagor enters into a loan agreement, he essentially receives tax-free cash, attributable to the mort-

20. With all due respect to our colleagues who have filed responsive opinions, both "disposition" and "foreclosure" equally speak to the transfer of property from one entity to another. No other conclusion may be drawn than that the plain meaning of "disposition of real property" encompasses mortgage foreclosures. While, as noted throughout this Opinion, we recognize the potential unfairness associated with the result reached, this Court cannot ignore the plain language of Section 7303(a)(3) merely to correct that inequity. *Accord* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

gagor's duty to repay the amount under the loan agreement. *Id.* Upon the foreclosure of nonrecourse mortgaged property, the property itself is converted, for the mortgagor's purposes, into income, *i.e.* cash, in the form of the forgiveness of the loan that he never repaid. *Id.* Put into the terms expressed in *Tufts*, Appellants have "obtained an economic benefit from the ... cancellation of the ... debt" associated with disposition/foreclosure of the Property.[21] Given all of this, we find no meaningful difference between the applicable provisions of the IRC, the Tax Reform Code, and the Department's Regulations, such that *Tufts* properly fits within the plain language established by Section 7303(a)(3) of the Code and Regulation 103.13.

### (B) Loss of Investment in the Partnership

■ We next consider whether Appellants' ultimate loss of their investment within the Partnership precludes the Department from assessing them PIT.[22] Appellants point primarily to *Commonwealth v. Rigling,* 48 Pa.Cmwlth. 303, 409 A.2d 936 (1980), in which the Commonwealth Court held that PIT may not be assessed in situations where the taxpayer never realized an actual gain. *Rigling,* as noted by the Commonwealth Court decision below, concerned an anomalous situation where there was a significant revision to the Code. The taxpayers in *Rigling* had purchased stock prior to June 1, 1971. For purposes of that case, the June 1 date was important, because the relevant revision to the Code was as follows:

For the determination of the basis of any property, real or personal, if acquired prior to June 1, 1971, the date of

---

**21.** We further find credence in the Department's contention that Regulation 103.13 does not concentrate so much on the "into cash" aspect of the transaction at issue, but rather focuses on the timing of when a tax may be assessed (or a loss deducted). The Department's position is supported by the whole of the regulation, specifically subsections (c) through (f), which codified a 1980 decision of the Commonwealth Court concerning the retroactive effect the 1971 amendments to the Code had on property transactions. *See Commonwealth v. Rigling,* 48 Pa.Cmwlth. 303, 409 A.2d 936 (1980).

**22.** This question is distinct from whether the same loss may be used to offset or reduce the amount of PIT assessed, which is discussed *infra,* Part V.

acquisition shall be adjusted to June 1, 1971, as if the property had been acquired on that date. If the property was acquired after June 1, 1971, the actual date of acquisition shall be used in determination of the basis.

72 P.S. § 7303(a)(3)(i). When the taxpayers sold the stock in tax year 1972, the Department assessed them PIT based upon the price of the stock as of June 1, 1971, which was lower than the original purchase price, thus creating a larger net gain. The Commonwealth Court reversed the assessment of PIT to the extent it was premised upon the June 1, 1971 stock price, finding that the gain assessed by the Department was artificial and absurd, and did not represent the true profit associated with the taxpayers' sale of the stock. Indeed, the income associated by the Department with the sale of the stock never actually occurred for taxpayers at all. *Rigling,* 409 A.2d at 940–41.

Appellants contend that the same thing occurred here: they are being assessed a tax by the Department for income they never received. They note, in fact, that they lost their entire investments in the Partnership. The Commonwealth cannot, in Appellants' view, "slice and dice an overall net loss to produce a gain taxable in Pennsylvania and an even bigger loss orphaned in some other state," *i.e.,* each Appellant's individual home state. Appellants' Brief at 27. Instead, Appellants aver that their taxable income must be linked to the actual income they received from their ventures into the Partnership. Because they received no net income, they cannot be assessed PIT.

The Department responds that the Commonwealth Court was correct in distinguishing *Rigling* from the instant appeal, because of the uniqueness of the question presented in *Rigling.* The Department contends that *Rigling* was essentially about retroactivity, which is not at issue currently. Rather, and despite Appellants' ultimate loss of their investments, under the *Tufts* rule, they still had a net gain of income in the form of the discharge of their indebtedness. "Gain may occur as a result of exchange of property, payment of the taxpayer's indebtedness, relief from a liability, or other profit realized

from the completion of a transaction." Department's Brief at 40 (quoting *Helvering v. Bruun*, 309 U.S. 461, 469, 60 S.Ct. 631, 84 L.Ed. 864 (1940)).

In our view, the Department is correct that, despite Appellants' ultimate loss of their investment, the *Tufts* rule controls and permits the assessment of PIT. A question could be raised if the amount of the forgiven debt was less than the investment loss—an issue that will, again, be investigated in further detail below. But, for the general purposes of determining whether PIT could be assessed in the first instance, the implementation of the Tufts rule pursuant to Pennsylvania law dictates that the forgiven nonrecourse debt constitutes income.

## IV. CALCULATION OF INCOME REALIZED

Having decided that the Department's assessment of PIT against Appellants was proper, we now turn to what the amount of gain should be for purposes of that assessment. As noted above, in relying almost exclusively upon *Tufts* and the *Allan* decision from the Court of Appeals for the Eighth Circuit, the Commonwealth Court upheld the assessment of PIT based upon the entire mortgage debt, both principal and accrued interest, in the amount of approximately $2.6 billion. *See Allan*, 856 F.2d at 1173 (holding, under its reading of *Tufts*, "the amount realized is the full amount of the nonrecourse liabilities which are discharged as a result of the transfer of the property.").

In seeking that we reject the Commonwealth Court's decision, Appellants place great emphasis on the "tax benefit rule," a now federally-codified product of federal common law, with its genesis in the United States Supreme Court cases of *Dobson v. Commissioner*, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943) and *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). To provide a full understanding of Appellants' contentions, we first review the tax benefit rule.

In general, the rule applies when a deduction of some sort for a loss is taken by a taxpayer in one year, only to

have the amount previously deducted recovered in a following tax year. Normally, the taxpayer would be responsible for including the recovered income on his personal income tax return for the year in which recovery occurred. The tax benefit rule states, however, that the recovery of the previously deducted loss is not includible to the extent that the earlier deduction did not reduce the amount of the tax owed in the year the initial deduction was taken. *Dobson; Hillsboro.* Put differently, the "rule permits exclusion of the recovered item from income [in a subsequent tax year] so long as its initial use as a deduction did not provide a tax saving." *Alice Phelan Sullivan Corp. v. United States*, 180 Ct.Cl. 659, 381 F.2d 399, 401–02 (1967). Commentators upon the rule have stated that it is "both a rule of inclusion and exclusion: recovery of an item previously deducted must be included in income; that portion of the recovery not resulting in a prior tax benefit is excluded." Boris I. Bittker & Stephen B. Kanner, *The Tax Benefit Rule*, 26 UCLA L.Rev. 265, 269 (1978–79).

Appellants contend that the Department is using the inclusionary portion of the tax benefit rule to assess PIT against them for their share of the $2.6 billion in income incurred upon the disposition of the Property, without concomitantly utilizing the exclusionary half of the rule to reduce the recognized gain by the amount of the accrued, compounded interest ($2.32 billion). Appellants concede, *arguendo*, that if any PIT should be assessed to them, it should be their share of $429,600,000, which equals the amount originally mortgaged ($308 million), plus the $121,600,000 in the accrued interest which was used to offset the resulting small amount of income the Partnership generated from the Property. Should *Tufts* apply to this case (and we have decided *supra* Part III that it does), in Appellants view, they should be "taxed on that amount [of the original principal] upon termination of the obligation to repay [it], and the accrued interest deducted against operating income should now be recaptured since it previously reduced taxable income." Appellants' Brief at 34.

In contending that the gain should not include the $2.32 billion in accrued interest, Appellants point to the PIT Guide published by the Department during the time in which the instant tax assessment occurred, specifically Table 16–2, which states that "unused PIT losses are eligible for the tax benefit rule." Pa. Personal Income Tax Guide, ch. 16, Pass Through Entities, Table 16–2 (Mar. 2006) (Table 16–2), *quoted in* Appellants' Brief at 35. Appellants contend that assessing them tax based upon the accrued interest has no basis in *Tufts* or the tax benefit rule, because, as the *Tufts* Court stated, the "rationale for [including a nonrecourse debt forgiveness as income] is that the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay," and when the mortgagor has that obligation released or forgiven, he "effectively will have received untaxed income at the time the loan was extended and will have an unwarranted increase in the basis of his property." *Tufts*, 461 U.S. at 309–10, 103 S.Ct. 1826, *quoted in* Appellants' Brief at 37. Here, in Appellants' view, neither they nor the Partnership ever incurred any "untaxed income" vis-à-vis the accrued interest because the accrued interest never had a basis in the Property itself. In other words, according to Appellants, the accrued interest never resulted in a tax saving in any previous tax year, and therefore it may be excluded from the calculation of gained income pursuant to the tax benefit rule.

Appellants further counter the Commonwealth Court's interpretation, and ultimate rejection, of the tax benefit rule. Appellants note that the Commonwealth Court articulated and utilized a three-prong test that a taxpayer has to meet in order to take advantage of the exclusionary aspect of the tax benefit rule: "First, there must be a loss that was deducted but did not result in a tax benefit. Second, there must be a later recovery on the loss. Third, there must be a nexus between the loss and the recovery." *Marshall*, 41 A.3d at 94 (quoting *John Hancock Financial Servs. v. United States*, 378 F.3d 1302, 1305 (Fed.Cir.2004)). While Appellants do not speak to when they ever took a deduction incident to a loss in

a prior tax year, they contend that all three requirements were satisfied: (1) the accrued interest never provided a PIT benefit; (2) the loss associated with the accrued interest was recovered when the Department assessed Appellants PIT based upon it; and (3) a clear nexus between the two exists.

In light of their opinion that the exclusionary portion of the tax benefit rule controls this issue, Appellants further disagree with the Commonwealth Court relying upon the Court of Appeals for the Eight Circuit's decision in *Allan* as the primary mechanism to include the accrued interest in the PIT assessment. Appellants read *Allan* as specifically contemplating the use of unpaid interest as a deduction against what would otherwise be realized income; therefore, *Allan* would permit the assessment of PIT against Appellants for the $121.6 million in accrued interest that the Partnership utilized to offset operational income from the Property. Nothing in *Allan,* in Appellants' view however, considers the inclusion of the unutilized, accrued interest (the remaining $2.198 billion).

The Department responds by discounting the "enormous importance" Appellants place on the tax benefit rule. Department's Brief at 45. Indeed, in the Department's view, the tax benefit rule has no application in the instant case at all. Quoting from the Bittker article cited to by Appellants, the Department notes that the tax benefit rule may only be implemented to the extent that previous "deductions or credits failed to reduce the taxpayer's taxes." Bittker & Kanner, *supra* p. 36, at 276. A "taxpayer cannot introduce deductions, however valid, that were not claimed on the earlier return to establish that deducting the recovered item served no tax benefit." *Id.* at 278. The Department contends that Appellants fall precisely into this prohibition, because they never took any deductions for PIT purposes in the tax years prior to the foreclosure in light of the Property never accruing any profit or income for the Partnership. In other words, there was no loss that was previously deducted; indeed, Appellants generally did not file Pennsylvania PIT returns for any of the prior tax years, because filing was unnecessary due to the lack of income. *Cf. John Hancock,* 378 F.3d at 1305 (noting that,

for the tax benefit rule to be applicable, "there must be a loss that was deducted but did not result in a tax benefit."). The Department thus concludes, "[b]ecause [Appellants] did not deduct anything at all, there is no corresponding portion of the subsequent income or gain (upon foreclosure) that can be excluded from the amount realized pursuant to the tax benefit rule." Department's Brief at 48.

To the Department, Appellants' reliance upon Table 16–2, which states that "unused PIT losses are eligible for the tax benefit rule" is also of no avail. The Department argues that "[t]he most that can be gleaned from Table 16–2 is that, in some situations, 'Partnerships and Pennsylvania S Corporations' with an 'unused PA PIT loss' may be 'eligible for tax benefit rule.' *Id.* at 49." Here, the general thrust of the tax benefit rule, as alluded to by the Department, does not give Appellants the benefit of Table 16–2 because, again, there simply was never a deduction for a PIT loss in a prior year, let alone one without tax consequences.

Instead, the Department contends that the Commonwealth Court correctly employed the *Allan* decision to uphold the assessment of PIT against Appellants based upon the accrued interest. The Department begins by harkening back to *Tufts,* which "alluded to 'the full value of the outstanding liability' being included in the amount realized upon the disposition of the mortgaged property." *Id.* at 41 (quoting *Tufts,* 461 U.S. at 310 n. 11, 103 S.Ct. 1826). The PMM Note specifically placed the Partnership, and therefore Appellants, on notice that interest would accrue on a compounded basis should the Property not cover operating expenses. Accordingly, to the Department, any accrued interest was always part of the outstanding liability on the PMM Note.

*Tufts,* however, involved a sale of property and not a foreclosure. The Commonwealth Court then, in the Department's view, correctly turned to *Allan,* which did concern a foreclosure upon property encumbered by a nonrecourse mortgage. The Department reads *Allan* as permitting "inclusion of the 'advances for interest added to the nonrecourse mortgage principal,' so long as those advances constituted 'a

legitimate debt obligation, *i.e.* a true loan.'" *Id.* at 42–43 (quoting *Allan,* 856 F.2d at 1173). In permitting the inclusion of the interest advances, the *Allan* Court looked to several factors in concluding that the mortgage contract constituted a true loan, including the arms-length nature of the business relationship, the clear terms of the mortgage and their consistence with standard business practices, the legitimate business reasons for structuring the nonrecourse loan in that manner, and the potential for repayment of the accrued interest. *Allan,* 856 F.2d at 1173. The Department says that all of these factors are present in the instant case.

### (A) Application of the Tax Benefit Rule

Given that we have already decided that *Tufts* applies to this case, resolution of the questions before us solely revolves around whether the accrued interest may properly be included within the assessment of PIT pursuant to *Tufts* and its progeny. As indicated by Appellants, a threshold inquiry into this analysis concerns the application, if any, of the tax benefit rule; if the rule applies, then we need not consider cases such as *Allan.*[23] However, as the Commonwealth Court did, we easily agree with the Department that the exclusionary arm of the tax benefit rule simply has no application in the instant appeal. As noted above, the tax benefit rule began as a product of federal common law with cases such as *Dobson,* and was eventually codified by Congress in Section 111 of the IRC; the Department has seemingly incorporated the rule into Pennsylvania tax law through Table 16–2. *Dobson* and its progeny, as well as Section 111, all require that the attempted exclusion of realized gain be related to a deduction without tax consequence from a prior year. Appellants have not pointed to any jurisprudence, regulation, or Department policy that states otherwise. Through all of their protestations regarding the mandatory application of the exclusionary arm of the tax benefit rule, Appellants never address this salient point, nor, more importantly, when they attempted to take the required

**23.** Our analysis in this regard differs from that of the Commonwealth Court, which found application of the tax benefit rule to be a follow-up question to the applicability to *Allan* in this case.

prior deduction.[24] Thus, in our view, there simply can be no application of the tax benefit rule in this case.

### (B) Application of Allan and its Progeny

Accordingly, we move to whether cases such as Allan support the inclusion of the accrued interest as taxable income for purposes of PIT. In *Allan*, the federal Department of Housing and Urban Development (HUD) insured a nonrecourse mortgage on an apartment building. After three years of ownership, the partnership defaulted upon the mortgage, and HUD acquired the mortgage from the mortgagee. Given the financial difficulties of the partnership, HUD paid the real estate taxes associated with the building and further charged the partnership interest based upon the mortgage principal. The amount of paid taxes, plus the interest, was then added to the mortgage principal. The partnership unfortunately continued to encounter additional financial difficulties, and HUD ultimately initiated foreclosure proceedings. In order to discontinue the proceedings, the partnership transferred its interest in the building, plus approximately $57,000, to HUD. By this point, the partnership's liability under the nonrecourse mortgage, including the real property taxes advanced by HUD and the interest upon the mortgage, totaled almost $1.5 million, and the partnership's adjusted basis in the apartment building was less than half of that.

Pursuant to the *Tufts* rule, the partnership reported a capital gain of approximately $700,000.[25] The primary issue in *Allan* was whether the reporting of the income as a capital

24. We note that the tax benefit rule is a complicated doctrine, with many different applications in varying factual scenarios. *See generally* William R. Lindsay, *An Asset–Based Approach to the Tax Benefit Rule,* 72 CAL. L.REV. 1257 (Dec. 1984) (discussing the various instances in which the tax benefit rule has been utilized by the courts). We do not indicate by our decision here that the tax benefit rule could never be properly implemented by a taxpayer in a nonrecourse mortgage foreclosure situation, or any other factual scenario for that matter. We merely hold that Appellants have failed to demonstrate how the rule could possibly be employed here given their failure to indicate where a failed reduction in the assessment of tax liability occurred in a year prior to 2005.

25. The capital gain represented the difference between the amount owed on the nonrecourse mortgage (including the accrued interest and real estate tax payments), and the adjusted basis in the property.

gain was proper, or whether the disposition of the nonrecourse mortgage constituted ordinary income, for which the partnership would be taxed at a higher tax rate. Accordingly, resolution of the issue revolved around whether "the [accrued interest] advances made by HUD were deemed paid by the [p]artnership through their addition to the outstanding mortgage principal amount," thus rendering the accrued interest part of the mortgage amount and subject to capital gains.

In relying upon *Tufts* and its predecessor *Crane,* the Court of Appeals first noted that the gain of income associated with the disposition of real property, whether a sale or foreclosure, "is the full amount of the nonrecourse liabilities which are discharged as a result of the transfer of the property." *Allan,* 856 F.2d at 1173. In finding that the accrued interest qualified as "nonrecourse liabilities," the Court of Appeals further determined that the paying of the real estate taxes and interest payments by HUD, and the addition of those amounts to the mortgage principal, constituted a "true loan" because of the arms-length relationship of the contract and the commercial, rather than tax shelter, nature of the accrued interest on the amount. Indeed, in the *Allan* Court's view, "HUD apparently hoped that its loan would afford the [p]artnership additional time to work out of its financial difficulties, and thereby be able to repay HUD the full amount of the mortgage obligation." *Id.* Accordingly, "the advances made by HUD to pay interest on behalf of the [p]artnership constituted a true loan properly added to the nonrecourse obligation, [and therefore] it follows inexorably that those amounts are properly included in 'amount realized' under *Tufts.*" *Id.* at 1174. The court thus concluded that the entirety of the income realized from the disposition of the nonrecourse mortgage constituted a capital gain.

A recent decision of the United States Tax Court further explained the *Allan* Court's reasoning. *See Smoker v. Commissioner,* 105 T.C.M. (CCH) 1389 (2013). Citing back to *Tufts,* the Tax Court noted that in circumstances such as *Allan* where the tax payments and accrued interest constitute a "true loan," "the taxpayer received the loan proceeds tax free on the assumption that he would repay the loan balance,

[... and therefore] 'the mortgagor effectively will have received untaxed income at the time the loan was extended.'" *Id.* at \*5 (quoting *Tufts*, 461 U.S. at 309–10, 103 S.Ct. 1826). The court noted this position was consistent with prior Tax Court rulings that the deferring of interest payments upon a mortgage is nothing more than a promise to pay those payments at a later time, and therefore nothing more than a loan. *Id.* at \*6 (citing *Heyman v. Commissioner*, 70 T.C. 482 (1978), *aff'd*, 633 F.2d 215 (6th Cir.1980)).

The issue presented is obviously one of first impression for this Court which, as our research has revealed, has not been addressed with any great regularity by federal tribunals. The Commonwealth Court below employed the *Allan* decision, albeit with some hesitancy. We do not feel the same reluctance. In our view, upon accepting *Tufts* as the controlling law of this case, *Allan* flows staunchly from it, and directs that the accrued interest constitutes income for purposes of PIT. Indeed, the terms of the PMM Note contemplated the postponement of the normal interest payments on the nonrecourse mortgage should the Partnership operate at a loss for any given month, with the acknowledgement that such payment would defer and compound on an annual basis at the agreed upon interest rate of 14.55%. This agreement was not contemplated as any sort of tax shelter, but rather with the understanding that the Partnership might well fail to turn any profits in the first few years of its ownership of the Property. As the *Allan* Court explained, "the Partnership secured additional loans from [the lender]," *i.e.*, funds to pay the interest, which the lender then compounded onto the original principal. *Allan*, 856 F.2d at 1173. This constitutes nothing more than an increase in the principal amount of the nonrecourse loan, which, pursuant to Section 7303(a)(3) and Regulation 103.13, as well as *Tufts*, is subject to the assessment of PIT as income associated with the disposition of real property.

## V. AVAILABILITY OF A REDUCTION OF INCOME REALIZED

In determining that the Department correctly assessed, as an initial matter, PIT to Appellants based upon

their share of the entirety of the nonrecourse mortgage—principal and accrued interest combined—we next examine whether Appellants may deduct the loss associated with their failed investments from the assessed PIT related to the foreclosure upon the Property. Pursuant to Department Regulation 121.13(a), 61 Pa.Code § 121.13(a), in light of the uniqueness of the Pennsylvania Tax Code, which divides income into eight specific categories, "a person shall not be allowed to offset a gain in one class of income with a loss in another class of income." For reasons unclear from its opinion, the Commonwealth Court refused Appellants any deduction on the basis that they sought a deduction based upon the net operating losses suffered by the Partnership during its years of existence, and not based upon losses arising from Appellants' individual investments in the Partnership. Indeed, the Commonwealth Court denied the deduction, holding that the foreclosure which generated the income gain constituted a disposition of real property (Section 7303(a)(3)), while the net operating losses of the Partnership represented a business expense (Section 7303(a)(2)).

Appellants disagree with this characterization, and argue at various points throughout their brief, including within their contentions regarding the tax benefit rule,[26] that their purchases (and ultimate losses) of units or partial units in the Partnership, and the foreclosure upon the Property, should each be classified under Section 7303(a)(3) of the Code as the disposition of real property, and therefore the deduction should be permitted on this basis. Appellants contend that a causative factor exists between the Partnership and the Property: the Partnership would not have existed without the Property, and when the Property was foreclosed upon, the

26. Perhaps Appellants' contentions in this regard are a result of the Commonwealth Court's analysis of the "cross-class income" issue as part and parcel of the tax benefit rule discussion. For the reasons elaborated upon *infra,* we find the question of whether the loss associated with the investment may reduce the assessed PIT for the Property's foreclosure to be nothing more than an application of relevant statutory and regulatory provisions, for which the tax benefit rule, which we have already determined is not applicable to this case in general, has no relevance.

Partnership liquidated and ceased to exist. Accordingly, Appellants posit that both the investment loss and the gain associated with the foreclosure constituted one economic transaction, all related to the disposition of the Property, and therefore the deduction should be permitted.

The Department responds with two discrete arguments. First, while recognizing that the liquidation of the Partnership and the foreclosure upon the Property were related events and close in time, the Department argues that they were not the same economic transaction; merely because the Property was foreclosed upon, the Partnership did not have to terminate. Indeed, the foreclosure occurred pursuant to Pennsylvania law, while the liquidation of the Partnership transpired under Connecticut law, thus, in the Department's view, demonstrating the separate nature of the two events.

The second contention is much more substantive, and diverges from the Commonwealth Court's reasoning below. Initially, it appears that the Department disagrees with the Commonwealth Court's suggestion that the disposition of the Property and the investment loss are two different classes of income. The Department notes that Section 7303(a)(3) of the Code includes the sale, exchange, or disposition of both "real property" and "intangible personal property." 72 P.S. § 7303(a)(3). "Unlike certain other forms of personal property, ... a partnership interest is inherently an intangible asset. It follows that the purchase or sale of a partnership interest is a purchase or sale of an intangible asset, potentially taxable under [Section] 7303(a)(3)." Department's Brief at 51 (citing 15 Pa.C.S. § 8561 (providing, within the Pennsylvania Revised Uniform Limited Partnership Act, that "[a] partnership interest is personal property")).

While this would seemingly mean that Appellants could take the deduction, *cf.* 61 Pa.Code § 121.13(a), the Department contends that intangible assets are "localized at the owner's domicile for purposes of taxation." *Wheeling Steel Corp. v. Fox*, 298 U.S. 193, 209, 56 S.Ct. 773, 80 L.Ed. 1143 (1936). The Department notes that its policy at the time of the foreclosure and liquidation was in accord with this well-settled

jurisprudence, and thus gains and losses from the disposition of intangible personal property cannot be taxed or deducted within the Commonwealth by a nonresident, and therefore cannot be considered for PIT purposes. Department's Brief at 52 (citing Pa. PIT Bulletin 2005–02, § 2, *found at* Reproduced Record (R.R.) 795a.). Rather, these losses should be claimed on the personal income tax returns of the individual Appellants in their domicile.

This issue presents an interesting conundrum, because Appellants argue that both the investment loss and the Property's foreclosure constitute the disposition of real property pursuant to Section 7303(a)(3), while the Department likewise avers that the investment loss should be considered under Section 7303(a)(3) as intangible personal property. Theoretically, this would negate the Commonwealth Court's determination that no deduction could be made by Appellants at all under the "cross-class" prohibition of Regulation 121.13(a).[27] However, the Department would have us decline the deduction based upon the situs of the intangible personal property, *i.e.,* Appellants' individual partnership interests, because the gain or loss from the disposition of intangible personal property cannot be accounted for within the Commonwealth; Appellants would have to claim those losses (or gains) on tax returns filed in their home states. *See* Pa. PIT Bulletin 2005–02, § 2.

After a close examination of the relevant provisions, we generally agree with the position of the Department.[28] As noted, any contentions by Appellants that their investments in

27. To the extent, however, the Commonwealth Court's decision could be read to hold that Regulation 121.13(a) prohibits a deduction of the net operating losses incurred by the Partnership over the course of its ownership of the Property from the assessed PIT due to the foreclosure, this conclusion would be correct, as the operational losses would unquestionably be classified as losses "from the operation of a business, profession, or other activity." 72 P.S. § 7303(a)(2).

28. For purposes of this Part, our agreement with the Department affirms the Commonwealth Court's decision, albeit on different grounds. *See Commonwealth v. Fisher,* 582 Pa. 276, 870 A.2d 864, 870 n. 11 (2005) ("A ruling or decision of a lower court will be affirmed if it can be supported on any basis despite the lower court's assignment of a wrong reason.") (quoting *Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398, 409 (1987)).

the Partnership constituted a business expense, and not intangible personal property, have been abandoned before this Court. With that, we first examine what, for tax purposes, Appellants' individual interests in the Partnership actually are. As noted above, Appellants argue that the Partnership interests and the disposition of the Property are essentially one in the same, while the Department contends that the Partnership interests are intangible personal property, which Section 7303(a)(3) includes as within the class of "[n]et gains or income from disposition of property." Intangible personal property is not defined anywhere in the Code or the Department's Regulations. It is defined, however, in Black's Law Dictionary as "property that lacks a physical existence[; e]xamples include stock options and business goodwill," as opposed to tangible personal property, which has physical characteristics. BLACK'S LAW DICTIONARY (9th ed.) (defining "property"). Further, we have persuasive guidance from the United States Supreme Court regarding partnership interests and their status as tangible or intangible personal property.

In 1928, Chief Justice Taft, writing for a unanimous Court, was tasked with determining whether a deceased person's interest in a limited partnership, which existed solely to own real property, constituted tangible or intangible personal property and, if intangible, its appropriate situs. *Blodgett v. Silberman*, 277 U.S. 1, 48 S.Ct. 410, 72 L.Ed. 749 (1928). Similar to the current Pennsylvania law cited by the Department (15 Pa.C.S. § 8561), New York law (the law governing the *Blodgett* case for state law purposes), provided that a "limited partner's interest in the partnership is personal property." *Id.* at 11, 48 S.Ct. 410. The Court concluded that "the interest of the decedent in the partnership ... was simply a right to share in what would remain of the partnership assets after its liabilities were satisfied. It was merely an interest in the surplus, a chose in action. It is an intangible...." *Id.*

The Code and relevant Department Regulations and Bulletins (such as Pa. PIT Bulletin 2005–02), in so far as they relate to partnership interests, are consistent with this precedent. While Appellants contend that the liquidation of the Partner-

ship and the foreclosure upon the Property constitute one in the same economic event, under the taxation rules in place in 2005, when the foreclosure and liquidation occurred, the cash infused into a partnership by a nonresident partner represented the interest that the partner had in the partnership; it had nothing to do with the operations of the partnership. *See* Pa. PIT Guide for 2005, ch. 16 at 8, *found at* R.R. 535a. In other words, it was merely a right to share in the assets and debts of the partnership upon its dissolution; it was not, however, the same as receiving the actual proceeds from the disposition of real property. *Accord Blodgett,* 277 U.S. at 11, 48 S.Ct. 410. Accordingly, the interests in the Partnership constituted intangible personal property, separate and apart from the real property interest associated with the Property.

The *Blodgett* Court further looked to whether the assessment of state estate taxes should be made by New York, where the partnership was established and the real property located, or by Connecticut, where the decedent resided. In determining that the assessment of tax should occur in Connecticut, the Court reaffirmed the common law understanding of the situs of intangible personal property:

At common law the maxim *'mobilia sequunter personam'* applied. There has been discussion and criticism of the application and enforcement of that maxim, but it is so fixed in the common law of this country and of England, in so far as it relates to intangible property, including choices in action, without regard to whether they are evidenced in writing or otherwise and whether the papers evidencing the same are found in the state of the domicile or elsewhere, and is so fully sustained by cases in this and other courts, that it must be treated as settled in this jurisdiction whether it approve itself to legal philosophic test or not.

* * *

[I]ntangible personalty has such a situs at the domicile of its owner that its transfer on his death may be taxed there.

*Id.* at 9–10, 48 S.Ct. 410.

Again, Pennsylvania law is consistent with this concept. "A partner or member who is a nonresident of this Common-

wealth shall report only income [or loss] of the partnership or association from sources within this Commonwealth." 61 Pa. Code § 107.2(c). Both the Code and Regulations provide that the only type of intangible personal property that shall be sourced to the Commonwealth for a nonresident is that "employed in a trade, profession, occupation or business carried on in this Commonwealth." 72 P.S. § 7301(k)(4); 61 Pa.Code § 101.8(a)(4). Given the above, Appellants' shares in the Partnership, and therefore their responsibility to the assets and debts of it, are at the situs of the partnership interest (*i.e.*, the source), which is intangible personal property, and therefore at the domicile of each individual Appellant. We note that this reasoning is supported by the obvious jurisdictional concerns implicated by one state taxing income sourced from within another. *See Shaffer v. Carter*, 252 U.S. 37, 56, 40 S.Ct. 221, 64 L.Ed. 445 (1920) (articulating the constitutional consequences of the assessment of taxes crossing state lines).

Accordingly, as the Department states, the investment interests Appellants accrued in the Partnership are distinct from the *Tufts*-related income from the disposition of the Property that the Partnership earned and then disseminated to each partner, Appellants included, in a proportion equal to their investment interests. *Accord* 72 P.S. § 7306. While the *Tufts*-related income is the disposition of real property located in Pennsylvania, and therefore income sourced from within the Commonwealth, the investments into the Partnership, and therefore the complete loss of them, are sourced with Appellants' home domiciles, outside of the Commonwealth.[29] Ac-

---

**29.** By way of hypothetical, if the Partnership had owned two pieces of property in Pittsburgh, upon the foreclosure of the U.S. Steel Building, the Partnership still could have theoretically existed to own, manage, and operate the second building. Still, each individual member of the Partnership, Appellants included, would have realized a gain of Section 7303(a)(3) income pursuant to *Tufts* upon the foreclosure of the U.S. Steel Building. As the Partnership continued to exist, however, if any individual partner wanted to sell his interest in the Partnership, at profit for example, that income upon the disposition of his interest in the Partnership, *i.e.* intangible personal property, would be sourced solely to the limited partner's home state; Pennsylvania would have no claim to the income associated with the sale of that interest in the Partnership.

cordingly, the investment loss cannot be used to reduce the amount of liability associated with the *Tufts*-related income.

## VI. DISPARATE TREATMENT OF NONRESIDENTS

 This brings us to the final question raised by Appellants jointly: whether the inability to deduct the investment loss from the income related to the foreclosure, while consistent with the statutory and regulatory PIT scheme, is nevertheless unconstitutional under the Privileges and Immunities, Commerce, and Equal Protection Clauses of the United States Constitution, U.S. CONST. art. IV, § 2; art. I, § 8, cl. 3, and amend. XIV, § 1, respectively; as well as the Uniformity Clause of the Pennsylvania Constitution, PA. CONST. art. VIII, § 1. Respectfully, the Commonwealth Court's discussion in this regard is limited, because it erroneously conflated the statutory/regulatory contentions discussed above in Part V with these constitutional claims. After reaching a similar determination to those contained herein regarding the statutory issues, the court summarily concluded that none of the constitutional provisions were violated because Pennsylvania possesses "limited powers" to tax nonresidents on sources of income from outside of the Commonwealth. *Marshall*, 41 A.3d at 97.

 For their federal constitution arguments, Appellants rely heavily upon *Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998), in which the United States Supreme Court found a New York statute, which effectively denied nonresident taxpayers a state income tax reduction for alimony paid, as violative of the Privileges and Immunities Clause, when resident taxpayers were permitted to take the deduction.[30] The *Lunding* Court

---

**30.** The entirety of Appellants' Equal Protection and Commerce Clause arguments is as follows: "Likewise, the Equal Protection Clause of the U.S. Constitution prohibits a state from classifying in-state and out-of-state taxpayers differently for tax purposes and the Commerce Clause prohibits a state from imposing taxes that discriminate against interstate commerce." Appellants' Brief at 29. Similarly, regarding the Uniformity Clause of the Pennsylvania Constitution, Appellants merely contend, "the Uniformity Clause is violated when 'taxpayers enjoying

first noted that states may defend the challenged statute "by demonstrating that '(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective.'" *Id.* at 298, 118 S.Ct. 766 (quoting *Supreme Ct. of N.H. v. Piper,* 470 U.S. 274, 284, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985)). Indeed, the object of the Privileges and Immunities Clause is to ensure that citizens from one state are on equal footing with those of the other states, so that, in the realm of taxation, one cannot be "subjected in property or person to taxes more onerous than the citizens of the latter State are subjected to." *Id.* at 296, 118 S.Ct. 766 (quoting *Shaffer,* 252 U.S. at 56, 40 S.Ct. 221). This is not an absolute or perfect protection, however, and the clause "affords no assurance of precise equality in taxation between residents and nonresidents of a particular State." *Id.* at 297, 118 S.Ct. 766. However, when a substantial inequality in treatment does occur, there must be a reasonable ground for that diversity. *Id.* at 298, 118 S.Ct. 766. Ultimately, the High Court in *Lunding* found that the New York alimony statute violated the Privileges and Immunities Clause because it discriminated against non-New York residents "irrespective of whether those [alimony] payments might somehow relate to New York-source income," and no substantial policy reason was proffered to justify the disparate treatment. *Id.* at 304, 118 S.Ct. 766.

Further, in a point emphasized greatly by Appellants instantly, the High Court rejected New York's contention that because it could not recognize the existence of non-New York sourced income, it likewise could not recognize deductions sourced from outside of the state. *Id.* at 308, 118 S.Ct. 766. While the Supreme Court acknowledged the general correct-

the same privilege of receiving, earning or otherwise acquiring the same amount of income as others [a]re required to pay a larger dollar amount of taxes.'" *Id.* at 30 (quoting *Gosewisch v. Commonwealth,* 40 Pa.Cmwlth. 565, 397 A.2d 1288, 1293 (1979)). Given the brevity of these contentions, and the obvious overlap between the various constitutional provisions, we will focus primarily on the claim as sounding under the Privileges and Immunities Clause.

ness of this statement, it refused to accept its legitimacy in *Lunding* because the alimony statute "[did] not incorporate such analysis on its face or . . . through legislative history," and further because "there are situations in which [the alimony statute] could operate to require nonresidents to pay significantly more tax than identically situated residents." *Id.* at 309–10, 118 S.Ct. 766. When the failure to permit a deduction affects the "taxpayer's overall earnings" within the taxing state without a reasonable policy explanation, that refusal cannot pass constitutional muster under the Privileges and Immunities Clause. *Id.* at 310, 118 S.Ct. 766.

Appellants contend that *Lunding* is on all fours with the appeal *sub judice,* because the only justification given by the Commonwealth Court upon the Department's assertion is that it cannot accept a deduction from a loss sourced from outside of the Commonwealth. Appellants assert that they and the Pennsylvania-resident limited partners of the Partnership are all on equal footing with regard to the investment loss, except for one point: the situs of the intangible personal property that is the investment. In Appellants' view, the nonresident status of themselves and the nonresident status of those affected in *Lunding* mandate the same result: that the assessment of PIT for the foreclosure without the concomitant ability to deduct for the investment loss, merely because Appellants are out-of-state residents, requires them "to pay significantly more tax than identically situated" Pennsylvania residents—indeed, approximately eleven times more tax. *Id.*

The Department responds by quoting extensively from *Shaffer,* in which Oklahoma residents were permitted by law to deduct losses that were sourced from both in-state and out-of-state, while non-Oklahoma residents subject to Oklahoma personal income tax could only deduct from their assessed tax losses that occurred within Oklahoma. In a succinct paragraph, quoted in full by the Department as the main thrust of its argument on this issue, the High Court rejected any privileges and immunities claim by the Oklahoma nonresidents, reasoning:

The difference, however, is only such as arises naturally from the extent of the jurisdiction of the state in the two classes of cases, and cannot be regarded as an unfriendly or unreasonable discrimination. As to residents it may, and does, exert its taxing power over their income from all sources, whether within or without the state, and it accords on them a corresponding privilege of deducting their losses, wherever these accrue. As to nonresidents, the jurisdiction extends only to their property owned within the state and their business, trade or profession carried on therein, and the tax is only on such income as is derived from those sources. Hence there is no obligation to accord them a deduction by reason of losses elsewhere incurred.

*Shaffer*, 252 U.S. at 57, 40 S.Ct. 221. The Department states that it was under "no obligation" to afford Appellants the ability to deduct in light of the jurisdictional bar against it taxing income from other states, and *"Lunding* did not disavow *Shaffer."* Department's Brief at 56.

Specific to the Uniformity Clause, the Department expounds further that Appellants and the resident limited partners are not treated any differently. *Cf. Gosewisch, supra* note 30. Residents and nonresidents alike are taxed at the same rate, are able to take the same exemptions and deductions, and Pennsylvania cannot encroach upon the taxing schemes of nonresidents' home states, just as those states cannot trespass upon Pennsylvania's taxing scheme. The only qualification regarding nonresidents is that the income taxed by the Department, and the concomitant deductions taken by the taxpayer, must be sourced from within the Commonwealth of Pennsylvania. *See* 61 Pa.Code § 107.2. The Department contends that, not only does this make sense, but it is constitutionally sound given rules of comity and the prohibition against the infringement of interstate commerce by the individual states. *See Shaffer*, 252 U.S. at 56–57, 40 S.Ct. 221.

The burden of a taxpayer challenging the constitutionality of a taxing statute is heavy, given the presumption that a statute is constitutional and the "road authority and wide discretion" the General Assembly has "in matters of

taxation." *Clifton v. Allegheny County*, 600 Pa. 662, 969 A.2d 1197, 1211 (2009). The statute must therefore "clearly, palpably, and plainly violat[e] the Constitution." *Id.* As noted, for a challenged statute to be found unconstitutional pursuant to a privileges and immunities claim, it must lack a substantial reason for the discrimination, and the discrimination must lack a substantial nexus to a legitimate state purpose. *See Lunding*, 522 U.S. at 298, 118 S.Ct. 766.

Although we find the question presented close, we ultimately agree with the Department that the inability of Appellants to deduct the investment loss does not violate the Privileges and Immunities Clause (or, for that matter, the Equal Protection or Commerce Clauses). First, we find *Lunding* to be distinguishable from the instant appeal. As related above, *Lunding* involved a specific type of New York taxable income—alimony—and therefore all of the related taxation of income and deduction of payments stemmed from the same economic event: a judicial decree regarding the payment of alimony. In the instant appeal, while under Pennsylvania law the disposition of the Property via foreclosure and the loss related to the investment in the Partnership both fall under the Section 7303(a)(3) class of income, the inability of Appellants to deduct the investment loss from the foreclosure gain because of the situs of the investment loss does not foreclose their ability to deduct from the foreclosure gain by some other Pennsylvania-sourced loss that falls under Section 7303(a)(3).

Second, we harken to *Shaffer*, and acknowledge that any gain Appellants would have realized upon their investment in the Partnership would have been sourced (and taxed) not in Pennsylvania, but rather in their home state; whereas any income they would have realized under the terms of the Partnership Agreement from the operating income of the Property would have been sourced (and taxed) in Pennsylvania. *See Shaffer*, 252 U.S. at 57, 40 S.Ct. 221 ("As to nonresidents, the jurisdiction [to tax] extends only to their property owned within the state and their business, trade or profession carried on therein, and the tax is only on such income as is derived from those sources."). Thus, Pennsylvania could not

have received tax on income for any gain on the investment, purely as a jurisdictional matter, as the investment in the Partnership was intangible personal property sourced in Appellants' home states. Therefore, "there is no obligation to accord them a deduction by reason of losses elsewhere incurred." *Shaffer*, 252 U.S. at 57, 40 S.Ct. 221. Indeed, as noted by the Commonwealth Court, Appellants admitted before that tribunal that "losses incurred by a nonresident on the disposition of intangibles are not taken into account for PIT purposes." Appellant–Marshall's Commonwealth Court Reply Brief at 9, *quoted in Marshall*, 41 A.3d at 97. This concession is consistent with the reasoning of *Shaffer*, and the policy behind Pennsylvania's refusal to permit a deduction.

Finally, we agree with the Department that the Uniformity Clause is not violated. Pennsylvania cannot infringe upon a foreign state's ability to tax just as a foreign state cannot encroach into Pennsylvania. This *quid pro quo* is a hallmark of the comity owed by states to each other. Indeed, the Department spells out this policy in a sound example:

> Not just their losses due to the liquidation of the Partnership, sourced to their home states, were irrelevant for PIT purposes. Any other losses they may have suffered from the disposition of property in their home states—say, if one had to sell a piece of home-state land at a huge loss due to deteriorating market conditions—would also be irrelevant for PIT purposes.

Department's Brief at 55 n. 37. For these reasons, we find that the refusal of the Department to grant Appellants' a deduction of their assessed PIT based upon the investment loss is constitutionally permitted.

## VII. INDIVIDUAL CLAIM RAISED BY THE WIRTH APPELLANTS

As related *supra* note 17, a final issue has been raised by Appellants–Ernest and Beverly Wirth, which they did not delineate in the statement of issues presented at the beginning of Appellants' joint brief. When the Wirths appealed the

184

assessment of PIT to the Board of Finance and Revenue, the Board's decision, in substance, affirmed. However, at the very end of the Board's order, it stated that the Wirths' petition for refund "is hereby sustained." No Commonwealth party appealed the order, but, obviously given the substance of the Board's rulings, the Wirths did not receive a refund. Accordingly, the Wirths raised to the Commonwealth Court the contention that they were entitled to a refund based upon the unchallenged language of the order. The Commonwealth Court rejected the argument, stating that the language in question was "clearly a clerical error." *Wirth v. Commonwealth*, No. 424 F.R. 2008, at *5, 2012 WL 8677727 (Pa. Cmwlth. Jan. 3, 2012) (memorandum). The Wirths dispute this conclusion, and contend that the Department should be bound by its failure to appeal the binding order by the Board granting the refund.

We cannot reach the merits of this issue, however, because an obvious problem exists: while Appellants filed a joint brief, the Wirths did not list this issue in the statement of issues presented for appeal as required by Pa. R.A.P. 2116(a).[31] "This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby." *Commonwealth v. Miller*, 283 Pa.Super. 411, 424 A.2d 531, 533 (1981). In accord with the clear language of Rule 2116(a) that "no question will be considered" unless it is included within the statement of issues, we find the issue raised by the Wirths to be waived.

## VIII. CONCLUSION

We are not without empathy for Appellants who find themselves with significant financial burdens because of the loss of

---

31. Rule 2116(a) provides, in relevant part: "The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail. The statement will be deemed to include every subsidiary question fairly comprised therein. No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby."

their investments, the liquidation of the Partnership, and the foreclosure of the Property. Nevertheless, the assessment of PIT by the Department was proper, as a matter of constitutional, statutory, and regulatory law. For the reasons articulated herein, the order of the Commonwealth Court sustaining the assessment of PIT is affirmed, and this matter will be remanded to the Board of Finance and Revenue in accord with the Commonwealth Court's opinion for calculation of the adjusted basis in the Property and determination of the amount of tax to be assessed.

Jurisdiction relinquished.

Justices EAKIN, TODD and McCAFFERY join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice STEVENS joins.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion with the exception of Part III(A), which is the section of the decision prompting Mr. Justice Saylor's Dissenting Opinion. On that distinct issue, I agree with much of Mr. Justice Saylor's dissent, albeit I ultimately concur in the result reached by the Majority.

Most significantly for present purposes, I agree with Justice Saylor's disagreement with the Court's holding that the question of whether the tax event at issue (the foreclosure upon a nonrecourse loan) results in an "amount realized" or "[n]et gains or income from the disposition of property" under 72 P.S. § 7303(a)(3) is resolvable as a matter of "plain language" statutory interpretation. There is no express language in the statute or implementing regulation that explicitly covers the type of "gain" involved here;[1] and, moreover, the Court's

1. Notably, the Commonwealth appears to concede that the regulation, 61 Pa.Code § 103.13, is ambiguous, as it argues:

In sum, § 103.13(a) is not as black-and-white as the Investors would have this Court believe. To be sure, income or gain may well

approval of the importation of a nonplain-language approach from a federal taxing regime involving different statutory language, as reflected in *Commissioner of Internal Revenue v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), obviously betrays that there is more at work than what the statute plainly states. Thus, I cannot join in the Majority's assertion that "the *Tufts* rule is encompassed within the plain meaning of 'disposition of real property' as contemplated by Section 7303(a)(3) and [Section § 103.13]." Majority Op. at 156, 94 A.3d at 841. Justice Saylor has ably laid out the countervailing complexity in his dissent, adding necessary context.

For my part, resolving the case as a matter of statutory construction, and having considered the competing concerns articulated in equally able fashion by Justice Saylor—encompassing, *inter alia,* separation of powers, considerations of policy with questions involving tax matters, the failure of the General Assembly to directly visit this particular issue, and the possible collateral consequences of our decision—in this close case offering no easy solution, I believe affirmance is less disruptive. The effect may be the same—*i.e.,* approval of an approach aligned with Tufts, despite that decision's flaws—but I believe it is important to candidly recognize the necessary complexity, as Justice Saylor does. Finally, I join in Justice Saylor's modest call to the General Assembly to address the issue and provide clearer guidance.

Justice STEVENS joins this concurring opinion.

Justice SAYLOR, dissenting.

I have much difficulty with the majority's assertion that, upon foreclosure, the outstanding balance on nonrecourse debt

be recognized if the disposition of property results in someone receiving "cash or other property," but that does not mean there cannot possibly be income or gain unless the taxpayer in fact receives "cash or other property."

Brief of Appellee at 38. The regulation, entitled "Net gains or income from disposition of property," reads: "A gain on the disposition of property is recognized in the taxable year in which the amount realized from **the conversion of the property into cash or other property** exceeds the adjusted basis of the property." 61 Pa.Code § 103.13 (emphasis supplied).

associated with a mortgage unambiguously results in either an "amount realized" or "[n]et gains or income from the disposition of property," under Section 303 of the Tax Reform Code of 1971. *See* Majority Opinion, at 155–56 & n. 18, 94 A.3d at 841–42 & n. 18.[1] Indeed, the federal tax case upon which the majority rests its decision, *Commissioner of Internal Revenue v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), and its predecessor *Crane v. Commissioner of Internal Revenue*, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947), have been widely regarded as foregoing a plain-meaning approach to statutory interpretation in favor of a non-textual construction of the Internal Revenue Code.[2] Along these lines, the *Tufts* Court itself articulated its holding in terms of an extension of

1. With reference to the circumstances before the Supreme Court of the United States in *Commissioner of Internal Revenue v. Tufts*, 461 U.S. 300, 103 S.Ct. 1826, 75 L.Ed.2d 863 (1983), one commentator puts it this way: "How, one may ask, can the 'fair market value' of a nonrecourse loan, secured by a $1.4 million property, be $1.85 million? How can the taxpayer have realized $1.85 million on being relieved of the loan, when he simply could have defaulted on the loan and surrendered a $1.4 million property?" Michael Livingston, *Practical Reason, "Purposivism," and the Interpretation of Tax Statutes*, 51 Tax L.Rev. 677, 693 (1996); *accord* John F. Coverdale, *Text As Limit: A Plea for a Decent Respect for the Tax Code*, 71 Tul. L.Rev. 1501, 1552 (1997) ("There is ... no way in which the language Congress enacted can plausibly be read to treat the entire amount of a nonrecourse mortgage as part of the amount realized when the remaining balance of the mortgage exceeds the value of the property."). Put otherwise, it is very difficult to say that there is "gain" or "income" in "relief" from personal (or, here, partnership) liability which never lay in the first instance.

2. *See, e.g.,* Robert A. Green, *Justice Blackmun's Federal Tax Jurisprudence*, 26 Hastings Const. L.Q. 109, 145 (1998) (explaining that *Tufts'* rationale is "impossible to reconcile" with the "language of the Code"); Coverdale, *A Plea for a Decent Respect for the Tax Code*, 71 Tul. L.Rev. at 1550–56 (characterizing *Tufts* as "anti-textual" and explaining that "[t]he *Tufts* Court did not attempt to reconcile its holding [that the outstanding amount of a non-recourse mortgage obligation must be included among assets realized upon disposition of the property] with the statutory language that directs that gain or loss is calculated by subtracting basis from the amount realized from the disposition of the property and defines 'amount realized' as the cash or other property received from the sale. In fact, 'no such explanation is possible.' "); *id.* at 1529 (referencing *Tufts* as exemplifying "the pernicious tendency of courts interpreting the Code to ignore Congress's commands to achieve the results they consider desirable."); Livingston, *Practical Reason*, 51 Tax L.Rev. at 703 (couching *Tufts* as embodying a "nonliteral" construction); Lawrence Zelenak, *Thinking About Nonliteral Interpretations of the Internal Revenue Code*, 64 N.C. L.Rev. 623, 625 (1986) ("One might

previous precedent (*Crane*) and an adoption of an administrative construction which the Court determined "cannot be deemed unreasonable." *Tufts*, 461 U.S. at 319, 103 S.Ct. at 1832; *see also id.* at 308 n. 5, 103 S.Ct. at 1831 n. 5 (expressing that the Court's construction of the statute was not a foregone conclusion, as the Court might have been amenable to considering other approaches if "*Crane* were not on the books"). An explanation subject to such reservations and conditions can hardly be said to be in the nature of plain-meaning implementation.

Finding that neither *Tufts* nor the majority's present decision embracing it embodies straightforward statutory interpretation, I believe this appeal reflects the debate concerning whether the appropriate judicial role in the tax arena should be limited to ordinary statutory interpretation, or whether the courts should undertake a more direct role in implementing tax policy. *See, e.g.,* Coverdale, *A Plea for a Decent Respect for the Tax Code,* 71 TUL. L.REV. at 1504 ("Antitextual interpretations are not peculiar to tax, but they occur in tax with unusual frequency.").. One commentator encapsulated some of the competing positions as follows:

> One of the classic scenarios in tax adjudication involves a conflict between the language of the [Internal Revenue] Code and the "tax logic" or policy of the case. There is a pattern to these cases: The "logical" or policy argument typically favors the government and is supported by major tax scholars, while the literal language usually favors the taxpayer and is cited by practicing lawyers. Proponents assert that the logical argument is self-evident and unavoidable, with dire consequences (including revenue losses) if the court fails to adopt the argument. The cases thus form a sort of statutory interpretation equivalent to the "form and substance" doctrine applied to tax transactions: The statute (or so the argument runs) may appear to say A, but

conclude from *Tufts* that the Court prefers to deal with conflicts between Code language and Code logic by pretending that the conflicts do not exist.").

must be interpreted to say B, if the foundations of tax law are to be preserved and undesirable consequences avoided.

Livingston, *Practical Reason*, 51 Tax L.Rev. at 691 (footnotes omitted); [3] *accord* Coverdale, *A Plea for a Decent Respect for the Tax Code*, 71 Tul. L.Rev. at 1501 ("Courts frequently interpret the Internal Revenue Code in ways that fall outside the plausible range of meanings of its language taken in context. They usually adopt such antitextual interpretations of the Code in an effort to close loopholes and achieve results in keeping with their perceptions of how the Code is intended to work.").

For my own part, I am on record as favoring a more restrained role for the judiciary in matters of statutory interpretation across the board, including the tax-law arena. I am of this view, because I believe that such approach demonstrates appropriate respect for separation of powers, encompassing an appreciation for the General Assembly's superior resources in policymaking ventures.[4] Furthermore, taxpayers should be afforded sufficiently clear, advance guidance regarding the reach of Pennsylvania's taxing regime so that they may order their personal and business affairs appropriately.[5]

3. Notably, the author identifies *Crane* and *Tufts* as "[a]rguably the most famous example[s] of tax logic," implemented by the judiciary, as contrasted with ordinary application of principles of statutory construction. *Id.* at 691.

4. *See, e.g., Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Found. v. PriceWaterhouseCoopers, LLP*, 605 Pa. 269, 301 & n. 27, 989 A.2d 313, 333 & n. 27 (2010) (referencing the broader tools available to the legislative branch in making social policy judgments, such as policy hearings and comprehensive investigations); *Naylor v. Twp. of Hellam*, 565 Pa. 397, 408, 773 A.2d 770, 777 (2001) (recognizing the General Assembly's superior ability to examine social policy issues and determine legal standards so as to balance competing concerns); *Program Admin. Servs., Inc. v. Dauphin County Gen. Auth.*, 593 Pa. 184, 192, 928 A.2d 1013, 1017–18 (2007) ("[I]t is the Legislature's chief function to set public policy and the courts' role to enforce that policy, subject to constitutional limitations.").

5. Professor Coverdale discusses this concern as follows:

The values of notice and predictability can outweigh achieving an optimal result in an individual case. These values are especially important in tax because, unlike most statutes that directly impact small numbers of people and that affect a restricted range of transac-

Were the Court to establish and enforce a sharper line of demarcation relative to the policymaking function, such practice should encourage the legislative branch and administrative agencies (when imbued with an appropriate delegation of substantive lawmaking power, *see, e.g., Borough of Pottstown v. Pa. Mun. Retirement Bd.,* 551 Pa. 605, 609–10, 712 A.2d 741, 743 (1998)), to give closer consideration to specific, emerging tax issues. Indeed, from my point of view, the absence of any particularized legislation or substantive regulations pertaining to the tax treatment of passive investors and non-recourse scenarios in Pennsylvania is surprising, particularly given the national attention focused on these subjects for several decades. *See, e.g.,* David F. Shores, *Deferential Review of Tax Court Decisions: Taking Institutional Choice Seriously,* 55 TAX LAW. 667, 684, 690 (2002) (explaining that the Supreme Court of the United States' *Crane* decision set the stage for the aggressive growth of a tax shelter industry which widely undercut public confidence in the federal tax system).

I realize there would be collateral consequences associated with a decision holding that the personal income tax does not reach non-recourse debt associated with a mortgage upon foreclosure,[6] and that, to the degree the essential choice must

tions, the tax laws influence a wide range of activities carried out by vast numbers of people. Often the decision to go forward with a transaction or not will depend on its tax treatment. In other cases, tax considerations will affect the form of the transaction. To plan their affairs intelligently, taxpayers need to know precisely the tax consequences of transactions.

Coverdale, *A Plea for a Decent Respect for the Tax Code,* 71 TUL. L.REV. at 11524.

6. Certainly, the tax arena presents many pitfalls for policymakers given the potential range of spiraling collateral consequences attending different approaches. *See, e.g.,* Shores, *Deferential Review of Tax Court Decisions,* 55 TAX LAW. at 690 (commenting that taxation is "a field beset with invisible boomerangs" (quoting *Arrowsmith v. Commissioner of Internal Revenue,* 344 U.S. 6, 12, 73 S.Ct. 71, 75, 97 L.Ed. 6 (1952) (Jackson, J., dissenting))). For example, as observed, the *Crane* decision is credited with spawning widespread pernicious tax-avoidance practices premised on detachment of tax benefits from economic ownership. *See id.* at 690 ("Perhaps no single event has done more to undercut the public's confidence in the federal income tax system than

be between extremes, the majority's approach of recharacterizing non-recourse obligations as income may represent the better tax policy.[7] Still, there are strong competing policies at stake, *i.e.*, the desire to implement the best available tax policy versus the virtues of judicial adherence to principled means of statutory interpretation consistent with the structure of our democratic form of government. *Accord* Coverdale, *A Plea for a Decent Respect for the Tax Code*, 71 TUL. L.REV. at 1506–07 (opining, while recognizing that refusal to adopt antitextual constructions may lead to undesirable results in individual cases, such restraint "reflects the proper roles of the legislature and the courts under out democratic constitutional system, it respects the distinctive characteristics of the Code, and it promotes the values of certainty and predictability that are very important when dealing with tax statutes.").

In summary, I find no basis in any Pennsylvania enactment or substantive regulation for recharacterizing an outstanding balance on nonrecourse debt associated with a mortgage as an "amount realized" or "[n]et gains or income from the disposition of property," upon foreclosure. Furthermore, I would not engraft a non-textual federal tax overlay onto the Pennsylvania personal income tax regime. To the degree that collateral consequences would attend such decision, I would clarify that

did the aggressive growth of tax shelter investments in the 1960's and 70's. Although congressional inaction is largely to blame, a fair share of the blame should lie at the feet of the Supreme Court's *Crane* decision and [the circuit court's] intentionalist interpretation that inspired it.").

7. Even so, it is difficult to overlook the apparent inequity in Appellants' situations. As they explain with reference to Appellant Marshall:

The partnership owned commercial real estate in Pennsylvania. The lender foreclosed on the property; the partnership lost the real estate; and the partnership liquidated as a result. The partnership and the partners received nothing upon foreclosure. The Pennsylvania Department of Revenue . . . took the position that the taxpayer realized a gain on the foreclosure in an amount more than 25 times what the taxpayer invested in the partnership and assessed [personal income tax] in an amount more than 75% of his investment. This result defies logic.

Brief for Appellants at 6. It must be acknowledged, at all events, that the one-size-fits-all application of the *Tufts* approach adopted by the majority functions as a particularly blunt instrument.

it is the responsibility of the General Assembly and/or the Department of Revenue to address these in a timely fashion, providing reasonable certainty to taxpayers. In terms of the appropriate judicial role, this should be limited to principled interpretation (or construction in the face of any ambiguities) of the existing statutes and valid substantive regulations.